## DUNCAN et al. v. LANDIS et al.

(Circuit Court of Appeals, Third Circuit. February 7, 1901.)

### No. 8.

1. BANKRUPTCY—JURY TRIALS—REVIEW BY WRIT OF ERROR.

Bankr. Act. 1898, § 19a, gives a person against whom an involuntary petition is filed the right to a trial by jury, if demanded, in respect to the question of his insolvency and any act of bankruptcy alleged in such petition. Section 6, cl. 1, of the act creating the circuit courts of appeals (26 Stat. 828) gives such courts "jurisdiction to review, by appeal or writ of error, final decision in the district court and the existing circuit courts in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law." Held, that the reviewing authority so conferred was wide enough to authorize that court to review the judgment of a district court entered on the verdict of a jury under such provision of the bankruptcy act, adjudging the person proceeded against a bankrupt, and to grant a writ of error therefor; that being, under the law and practice of the federal courts, the necessary and appropriate proceeding for such review.[1]

2. SAME.

Such jurisdiction to review the action of a court of bankruptcy by writ of error, where that is the appropriate proceeding therefor, is also within, or at least consistent with, that conferred on circuit courts of appeals by section 24a of the bankruptcy act of 1898, which invests them "with appellate jurisdiction of controversies arising in bankruptcy proceedings from the courts of bankruptcy from which they have appellate jurisdiction in other cases."

---

[1] Appeal and review in bankruptcy proceedings, see note to In re Eggert, 43 C. C. A. 9.

**3. SAME.**

The trial of an issue of fact to a jury under Bankr. Act 1898, § 19a, is a trial according to the course of the common law, and, under the seventh amendment to the constitution, cannot be reviewed by what is technically known as an "appeal," but must be the subject of a writ of error, as that writ was known at the common law, upon which questions of law arising upon the face of the record, and rulings of the court excepted to and preserved by bill of exceptions, can alone be considered; and the power of the reviewing court is limited, so far as the issue of fact is concerned, to the awarding of a new trial.

**4. SAME—RIGHT TO BILL OF EXCEPTIONS.**

Under the practice of the courts of the United States, where an issue is tried by a jury according to the course of the common law, as under the provisions of Bankr. Act 1898, § 19a, no statutory provision is necessary to entitle a party to have the rulings of the court at such trial made a part of the record by bill of exceptions.

**5. SAME—ACTS OF BANKRUPTCY—SUFFERING OR PERMITTING PREFERENCE.**

Bankr. Act 1898, § 3a, defining "acts of bankruptcy," requires in all cases some conscious and voluntary act on the part of the debtor, in addition to the fact of his insolvency, to render him subject to involuntary proceedings; and to constitute an act of bankruptcy under clause 3, by his "having * * * suffered or permitted, while insolvent, any creditor to obtain a preference through legal proceedings, and not having * * * vacated or discharged such preference," there must have been some act of the will on the part of the debtor, either by way of active procurance or voluntary acquiescence. The entering of judgment by a creditor on a judgment note executed by the debtor years before, and prior to the passage of the bankruptcy act, by which the creditor obtained a preference which was not discharged within the required time, where the action of the creditor was without the connivance of the debtor, and beyond his power to prevent, does not constitute an act of bankruptcy on his part, under such provision. Dallas, Circuit Judge, dissenting.

**6. SAME—FAILING TO DISCHARGE LEGAL PREFERENCE.**

Under Bankr. Act 1898, § 3a, cl. 3, a debtor does not commit an act of bankruptcy merely by failing to vacate or discharge a preference obtained by a creditor through legal proceedings, unless, being insolvent, he also "suffered or permitted" such preference to be obtained, within the meaning of such clause; nor will his failure to vacate or discharge such a preference warrant the inference either that he was insolvent or that he consented thereto, where there is no legal ground upon which he could vacate it, and he is unable to discharge it by payment. To so construe the provision as to require the debtor in such case to file a voluntary petition in bankruptcy, in order to negative his consent to the preference, would be to fix upon him the status of a bankrupt, either voluntary or involuntary, solely as a result or effect of his creditor's act in obtaining a preference, which he was powerless to prevent, and not by reason of any act of his own, which is not justified by the language used, nor by the general spirit and scope of the act construed as a whole, and is contrary to the construction placed by the supreme court upon analogous provisions of the act of 1867.

**7. SAME—INSOLVENCY—FAIR VALUATION OF PROPERTY.**

Bankr. Act 1898, § 1, cl. 15, providing that "a person shall be deemed insolvent within the provisions of this act whenever the aggregate amount of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts," gives a definition of "insolvency" which must be strictly adhered to in proceedings under the act; and an instruction by the court upon an issue as to the insolvency of an alleged bankrupt, tried before a jury under the provisions of section 19a, which makes the solvency of the debtor dependent on his ability to realize a sufficient amount from his property to pay his debts, and which, in effect, defines a "fair valuation" of the property as the amount which the debtor

would have been able to realize therefor, considering his situation, the number and amount of his obligations, and the time when they were due, is misleading and erroneous, as adding conditions not set forth in the statute, and as laying down an erroneous rule for determining a fair valuation.

**8. SAME—EVIDENCE OF INSOLVENCY—COMPETENCY OF HUSBAND'S STATEMENTS AGAINST WIFE.**

Under the statute of Pennsylvania (P. L. 1887, p. 158, § 5) which provides that husband and wife shall not be competent or permitted to testify against each other except in proceedings for divorce, and which is by Rev. St. § 858, made the rule in courts of the United States held within that state, evidence of statements made by a husband while acting as agent for his wife in conducting her business, but not in her presence, are not competent against her to prove her insolvency in involuntary proceedings in bankruptcy against her.

**9. SAME—STATEMENTS OF AGENT.**

The fact that a husband acted as general manager for his wife in conducting a store owned by her, without any written authority defining the scope of his powers, did not constitute him her general agent outside of matters pertaining to the buying and selling of goods in such store, in such sense that statements made by him to her creditors regarding her financial condition, not in her presence nor in relation to the purchase or sale of goods, would be binding upon her, or admissible against her to prove her insolvency in involuntary proceedings in bankruptcy against her.

Appeal from and in Error to the District Court of the United States for the Western District of Pennsylvania.

Clarence L. Peaslee and T. M. B. Hicks, for appellant and plaintiffs in error.

H. T. Ames, for appellees and defendants in error.

Before DALLAS and GRAY, Circuit Judges, and BRADFORD, District Judge.

GRAY, Circuit Judge. In the court below an issue was tried by a jury to determine whether Sallie E. Duncan, the appellant, who is one of the plaintiffs in error, had committed a certain act of bankruptcy charged against her.

At the opening of the argument in this court a motion was made by the appellees and defendants in error to quash the writs of error. This was argued at great length and with much ingenuity by counsel for appellees; the substantive proposition of the argument being that while admitting that the rulings of a trial court in a jury trial cannot be reviewed in an appellate court upon appeal, but can only be reached by a writ of error, no writ of error in such a case as this could be sued out except pursuant to some express authority of an act of congress; the contention being that neither the act of congress of 1898, creating the uniform system of bankruptcy, nor the act of March 3, 1891, establishing and conferring jurisdiction on the court of appeals, had authorized a writ of error in the case of a jury trial as provided for by the bankrupt act. The jury trial in this case was asked for and ordered under the provisions of section 19 of the bankrupt act, which is as follows:

"Sec. 19. Jury Trials. (a) A person against whom an involuntary petition has been filed, shall be entitled to have a trial by jury, in respect to the question of his insolvency, except as herein otherwise provided, and any act of bankruptcy alleged in such petition to have been committed, upon filing a written application therefor at or before the time within which an answer may be filed. If such application is not filed within such time, a trial by a jury shall be deemed to have been waived. (b) If a jury is not in attendance upon the court, one may be specially summoned for the trial, or the case may be postponed, or, if the case is pending in one of the district courts within the jurisdiction of a circuit court of the United States, it may be certified for trial to the circuit court sitting at the same place, or by consent of parties, when sitting at any other place in the same district, if such circuit court has or is to have a jury first in attendance. (c) The right to submit matters in controversy, or an alleged offense under this act, to a jury shall be determined and enjoyed, except as provided by this act, according to the United States laws now in force or such as may hereafter be enacted in relation to trials by jury."

The issue to be determined by the jury was made by the petition of the creditors charging the alleged bankrupt with certain acts of bankruptcy, and by the denial thereof on the part of the alleged bankrupt, and by the answer and plea of Theodore H. Gehly, an execution creditor, to the said petition. The case was tried by a jury in the court below, and exceptions taken and bills sealed both as to the admission of evidence and as to the instructions to the jury. This trial by jury was a matter of right, and could not be denied if seasonably demanded. The verdict of the jury was conclusive of the issue of fact, and binding upon the court. Final judgment must be entered upon such verdict, either adjudging or refusing to adjudge the defendant to be a bankrupt. The trial, therefore, proceeded according to the course of the common law.

Section 6, cl. 1, of the act to establish circuit courts of appeals (26 Stat. 828), provides as follows:

"Sec. 6. The circuit courts of appeals established by this act shall exercise appellate jurisdiction to review, by appeal or writ of error, final decisions in the district court and the existing circuit courts in all cases other than those provided for in the preceding section of this act, unless otherwise provided by law."

The language here used indicates an intention to extend the reviewing authority of the court of appeals widely enough to include all final decisions in the district courts not otherwise provided for by law; and the writ of error referred to in this provision is applicable alike to judgments of the district court and of the circuit court, where such a writ is necessary and appropriate to invoke the reviewing authority of the appellate court. In addition to this general and comprehensive provision of the statute establishing the circuit court of appeals, which we think sufficiently warrants the writ of error in this case, the bankrupt act of 1898 provides, in section 24, c. 4, as follows:

"Sec. 24. Jurisdiction of Appellate Courts. (a) The supreme court of the United States, the circuit courts of appeals of the United States, and the supreme courts of the territories, in vacation in chambers and during their respective terms, as now or as they may be hereafter held, are hereby invested with appellate jurisdiction of controversies arising in bankruptcy pro-

ceedings from the courts of bankruptcy from which they have appellate jurisdiction in other cases. The supreme court of the United States shall exercise a like jurisdiction from courts of bankruptcy not within any organized circuit of the United States and from the supreme court of the District of Columbia."

We perceive nothing in the provisions of this section inconsistent with or which supersedes the provisions of section 6, cl. 1, of the act establishing circuit courts of appeals, above referred to. The language of the section conferring upon the circuit courts of appeal "appellate jurisdiction of controversies arising in bankruptcy proceedings from the courts of bankruptcy over which they have appellate jurisdiction in other cases," is broad and applicable to all "controversies arising in bankruptcy proceedings," etc. If there could have been any doubt in construing section 6 of the judiciary act of 1891, above quoted, that "final decisions in the district court" included final decisions in such a court when acting as a court of bankruptcy, it has been removed by section 24 of the bankrupt act, as above quoted. For this purpose, among others, this provision seems to have been inserted. At all events, there can be no doubt now, in view of this provision, that inasmuch as the circuit courts of appeal have appellate jurisdiction over district courts in other cases, so, also, they have the same jurisdiction over those courts when acting as courts of bankruptcy. That a jury trial has been ordered under the provisions of section 19 of the bankrupt act does not remove the controversy from this appellate jurisdiction. Section 24 does not state, nor was it necessary to state, how the appellate jurisdiction provided for should be invoked. The practice of the courts, but especially the act of congress establishing the court of appeals, already referred to, had designated "writs of error" and "appeals," as those terms are used and understood in our jurisprudence, as the appropriate methods for invoking the appellate jurisdiction. The form, scope, and peculiar function of these two several methods of exercising appellate jurisdiction are well understood, and their peculiar and separate functions clearly established by the decisions and practice of the courts. This practice has so shaped itself that the rulings of a trial court in a jury trial can only be reviewed in an appellate court by a writ of error, while an appeal is peculiarly fitted to equity proceedings, where it brings for review to the appellate court both the law and the facts. On the other hand, where the right to trial by jury exists and has been invoked, neither the appellate court nor the court below can review the facts, but can only control in matters of law, which a writ of error is peculiarly fitted to raise in an appellate court. Indeed, the provision of the constitution that "no fact tried by a jury shall be otherwise re-examined in any court of the United States, than according to the common law," is decisive on this point; and since the case of Parsons v. Bedford, 3 Pet. 433, 7 L. Ed. 732, no question can be made but that such a case as the present, in which there has been a trial by jury, as authorized by section 19 of the bankrupt act, is a trial according to the course of the common law, and cannot

be reviewed by what is technically known as an "appeal," but must be the subject of a writ of error, as that writ was understood and used at common law. Insurance Co. v. Comstock, 16 Wall. 258, 21 L. Ed. 493. In the case of Parsons v. Bedford, supra, Story, J., in delivering the opinion of the court, after discussing the scope of the first clause of the seventh amendment to the constitution, proceeds as follows:

"But the other clause of the amendment is still more important, and we read it as a substantial and independent clause: 'No fact tried by a jury shall be otherwise re-examinable, in any court of the United States, than according to the rules of the common law.' This is a prohibition to the courts of the United States to re-examine any facts tried by a jury in any other manner. The only modes known to the common law to re-examine such facts are the granting of a new trial by the court where the issue was tried or to which the record was properly returnable, or the award of a venire facias de novo by an appellate court for some error of law which intervened in the proceedings. The judiciary act of 1789, c. 20, § 17, has given to all the courts of the United States 'power to grant new trials in cases where there has been a trial by jury, for reasons for which new trials have usually been granted in the courts of law.' And the appellate jurisdiction has also been amply given by the same act (sections 22, 24) to this court, to redress errors of law, and for such errors to award a new trial, in suits at law which have been tried by a jury."

Prior to the statute of Westminster (13 Edw. I. c. 31) a writ of error at common law could be had only for an error apparent on the face of the record or for an error in fact, but by that ancient statute it was provided that exceptions to the opinion and direction of the court might, by bills of exception, be made a part thereof, and therefore be reached by the writ of error. In this way so much of the facts of the case as were necessary to make plain the question of law on which the exception was founded are incorporated in the record.

It seems, also, to be the contention of the appellees (although on this point the argument of their brief is obscure) that the rulings of the court at the trial could not be made part of the record by bills of exception, except by statute, inasmuch as at common law, before the statute of Westminster, such matters could not appear in the record. The statute of Westminster (13 Edw. I. c. 31), as an ancient statute, has become a part of the common law in this country, and under it the right to a bill of exceptions in civil cases at law and in superior courts has been firmly established. It would seem that in most of the states the practice depends upon and is regulated by special statutes, which must, of course, measure and control the same. The only regulation made by congress as to bills of exception is that contained in section 953 of the Revised Statutes, which provides that they shall be sufficiently authenticated by the signature of the presiding judge, without any seal. In re Chateaugay Ore & Iron Co., 128 U. S. 555, 9 Sup. Ct. 150, 22 L. Ed. 508. But the right to bills of exceptions in a civil case at law has always been recognized in the federal courts, and it is never questioned that when allowed they constitute a part of the record brought up to an appellate court by a writ of error. Mr. Justice Story, in Parsons v. Bedford, uses this language:

"Nor is there any inconvenience from this construction; for the party has still his remedy, by bill of exceptions, to bring the facts in review before the appellate court, so far as those facts bear upon any question of law arising at the trial; and if there be any mistake of the facts, the court below is competent to redress it, by granting a new trial."

See Rule 4 of the supreme court regulating bills of exception.

No sufficient reason can be given why, if the present case is properly before this court by a writ of error, as we think it is, the record should not include bills of exception sealed by the court below.

The act of 1867, in its forty-first section, by a provision analogous to that on the same subject in the present act, granted, under certain circumstances, a jury trial to a debtor against whom the petition in involuntary bankruptcy had been filed. In the case of Insurance Co. v. Comstock, 16 Wall. 258, 21 L. Ed. 493, already referred to, a motion was made in the supreme court to dismiss a writ of error to the court of bankruptcy on a judgment in a case tried by a jury before said court. Objection was made there, as here, that the writ of error would not lie, because not specially provided for. The supreme court, however, held that the writ of error was properly taken; and, in an interesting opinion, which assumes that bills of exception were properly allowed by the court below, decided, on the ground that the proceeding below was a case at law, that a writ of error was properly issued to bring the case within the reviewing authority of the circuit court. In the course of its opinion the court said:

"Such a provision is certainly entitled to a reasonable construction, and it seems plain, when it is read in the light of the principles of the constitution and of analogous enactments, and when tested by the general rules of law applicable in controversies involving the right of trial by jury, that the process, pleadings, and proceedings must be regarded as governed and controlled by the rules and regulations prescribed in the trial of civil actions at common law. Congress, it must be assumed, in conceding to the debtor the right to demand a trial of the issue by a jury, intended to confer a right of some value, which would be converted into a mockery if the judge presiding over the trial may exclude by his rulings all the evidence which the debtor offers to disprove the charges set forth in the petition, and he (the debtor) be left without any power to resort to an appellate tribunal to correct the errors committed by the bankrupt court. * * * Apply these rules to the case before the court, and it is clear beyond doubt that the circuit court erred in dismissing the writ of error for the want of jurisdiction, as it was the right of the excepting party to have the questions, if duly presented in the bill of exceptions, re-examined by the circuit court."

We are of opinion, therefore, that the writ of error in this case was authorized, and that the record brought up to this court in obedience to the said writ properly contained the bills of exception therein stated. The motion to quash the writ must be denied.

Sallie E. Duncan, the appellant, did business in the city of Williamsport, Pa., under the name of the Duncan Department Store; her husband, James M. Duncan, being her general agent and business manager. In April, 1896, certain promissory notes in favor of Theodore H. Gehly, Gandor & Munson, and the First National Bank of Williamsport, with warrants of attorney to confess judgment, were executed and given by Sallie E. Duncan to the parties

named. On December 31, 1898, by virtue of the said warrants, judgments were entered in the court of common pleas of Lycoming county against the said Sallie E. Duncan for sums aggregating $8,328.67. Executions were issued thereon, and levy made by the sheriff upon the property of the defendant. Sallie E. Duncan was also indebted to other creditors in the sum of $7,300. These other creditors, or some of them, filed a petition in the court below on January 7, 1899, praying that the said Sallie E. Duncan should be adjudged a bankrupt, upon the ground that within four months next preceding the date of their petition she had committed an act of bankruptcy, in that she did on the 31st day of December, 1898, suffer and permit, while insolvent, certain of her creditors to obtain a preference through legal proceedings, and had not, within five days before the time fixed by the sheriff for the sale of her property levied upon by him, vacated and discharged such preference. The entry of judgments upon the warrants above referred to, and the levying of execution thereon, were then set out as the preferences. She filed an answer to the petition in bankruptcy against her, denying that she had committed the act of bankruptcy alleged in the petition or that she was insolvent, and demanded a trial by jury. Gehly, one of the execution creditors, also appeared and filed an answer or plea denying that Sallie E. Duncan had committed the act of bankruptcy set forth in the petition, or that she was insolvent, and demanded a trial by jury. The court, therefore, ordered the case down for trial. At this trial the petitioning creditors were the plaintiffs, and Sallie E. Duncan and Gehly were the defendants. At the trial witnesses were called to testify as to conversations which they had had with James M. Duncan, the husband of Sallie E. Duncan, and general manager of the department store. The witnesses within a short time before the alleged act of bankruptcy had presented to James M. Duncan, for payment, claims of certain creditors of Sallie E. Duncan. The defendants objected upon three grounds to the admission of this testimony, to wit: First, because a person is to be deemed insolvent within the provisions of the bankrupt act, whenever "the aggregate of his property  *  *  * shall not at a fair valuation be sufficient in amount to pay his debts," and the testimony offered did not tend to prove the value of such property; second, because such declarations or statements of James M. Duncan, made in the absence of Sallie E. Duncan and of Theodore H. Gehly, would not be evidence against either of them; and, third, because the declarations of James M. Duncan could not be received in evidence against his wife. The court overruled these objections and admitted the testimony solely upon the question of the insolvency of Sallie E. Duncan. The substance and effect of the testimony so admitted was that James M. Duncan stated that Mrs. Duncan could not at that time pay in full the claims presented, and that, if the creditors all pressed their claims at that time, it might result in the store being closed by the sheriff. The defendants contended that the property of Mrs. Duncan would aggregate, at a fair valuation, from $14,000 to $15,000, which would be a sufficient

amount to pay her debts, and that she, therefore, was not insolvent. The defendants excepted to the charge of the court to the jury upon this point, claiming that the instructions to the jury qualified the statutory definition of insolvency in two material particulars, to wit: First, that these instructions required as a necessary element of solvency the ability to realize from one's property and meet his obligations in the ordinary course of business; and, second, that these instructions required the jury, in determining what the fair valuation of the property of the alleged bankrupt was, to take into consideration the amount of her obligations and the time when they fell due, as these were elements regarded by the purchasers of such property. The defendants contended upon the trial that, in order to find that Mrs. Duncan had committed the act of bankruptcy alleged, the jury would have to find, not only that she was insolvent, but also that she had done some act to initiate or facilitate the legal proceedings by which her property had been levied upon by the sheriff. The court, however, charged the jury that, if Mrs. Duncan was insolvent, then the entry of these judgments and issuing of these executions against her, though the notes and warrants of attorney on which the judgments were entered were given more than two years before the passage of the bankrupt act, constituted the act of bankruptcy, even though she had done no act to initiate or facilitate the said proceedings, and that, if they found her to be insolvent, they should also find that she had committed the act of bankruptcy aforesaid. Under the testimony so admitted, and the charge of the court, the jury returned a verdict for the plaintiffs, upon which verdict the court rendered judgment adjudging Mrs. Duncan a bankrupt. Thereupon an appeal was taken from this judgment by Mrs. Duncan, and also writs of error by both Mrs. Duncan and Theodore H. Gehly.

The record in this case contains 12 assignments of error. Of these, the eighth, tenth, and twelfth challenge our consideration as raising not only an important, but, in the view we take of it, a controlling, question in the case. This question arises upon the following instruction given by the learned judge of the district court to the jury:

"Such an issue was framed, and you have been sworn to try the issues raised in that case. Those issues are two in number: First, was Sallie E. Duncan insolvent? And, second, did she give undue preference to those execution creditors? Now, I may say to you in this case that, if you find that Sallie E. Duncan was insolvent at the time when those judgments were entered and execution issued, then, as a matter of law, she has given an undue preference to Gehly and the First National Bank, by neglecting to take proper steps to avoid that preference. So that it is for you to determine in this case whether, at or about the time of the filing of the petition in this case, to wit, early in January, 1899, Sallie E. Duncan was insolvent."

The evidence, as already stated, and not disputed, shows that Sallie E. Duncan, for good and valuable consideration, executed and gave the judgment notes involved in these alleged acts of bankruptcy on the 1st day of April, 1896, and that the alleged preference was created by having judgments entered upon them and execution

levied by their holders December 31, 1898. The position therefore taken by the district court in its instruction to the jury was that the mere action of the plaintiffs in said judgment in entering the same and issuing executions thereon upon the authority of warrants of attorney given by Sallie E. Duncan more than two and a half years before, and before the passage of the bankrupt act, constituted a suffering or permitting by her of the obtaining of a preference by such creditors at the time of such entry and levying of execution, within the meaning of the bankrupt act, because she did not within "five days," etc., vacate or discharge such preference; and this though, as is assumed, the said Sallie E. Duncan, not only did no act to initiate or facilitate the proceedings of the creditors subsequent to the giving of the judgment notes, but could not have controlled, hindered, or delayed such proceedings. We do not agree with the learned judge in this construction of the bankrupt act. If sanctioned, it perverts or ignores the common and ordinary meaning of English words, and deprives the debtor of the protection which those words, in their common, everyday signification, would give, and, we must assume, were intended to give. Section 3 of the act of 1898 deals with and describes acts of bankruptcy. The section is headed, "Acts of Bankruptcy," and then proceeds to say that "(a) acts of bankruptcy by a person shall consist of his having" (1) "conveyed, transferred, concealed," etc., "* * * property with intent to hinder or defraud his creditors"; or (2) "transferred, while insolvent, property, with intent to prefer"; or (3) "suffered or permitted, while insolvent, any creditor to obtain a preference through legal proceedings, and not having at least five days before a sale or final disposition of any property affected by such preference, vacated or discharged such preference"; or (4) "made a general assignment for the benefit of his creditors"; or (5) "admitted in writing his inability to pay his debts and his willingness to be adjudged a bankrupt on that ground." It is to be observed that the section expressly states that it deals with and concerns acts of the debtor. Unquestionably, clauses 1, 2, 4, and 5 require a voluntary act. The question, then, is whether clause 3 does not require the same. It certainly does, unless it is an exception to the general scheme of the section. The grammatical structure of the section is that of a single sentence, in which the numbered clauses all depend upon and relate to the opening clause, viz. "acts of bankruptcy by a person shall consist of his having" done certain things. An act signifies something done voluntarily by a person. An act is the result of an exercise of the will. Black's Law Dictionary says:

"In a more technical sense, it means something done voluntarily by a person, and of such a nature that certain legal consequences attach to it. Thus, a grantor acknowledges a conveyance to be his 'act and deed,' the terms being synonymous."

The act with which we are here concerned is the debtor's having suffered or permitted, while insolvent, a creditor to obtain a preference, etc. Both the words, "suffer" and "permit," while they do not necessarily connote strong affirmative action, do involve such

an exercise of the will as effects results. The "suffering or permitting" a creditor to obtain a preference, within the meaning of clause 3, may consist of connivance between the debtor and creditor. But in any event there must be some act of the will on the part of the debtor, whether by way of active procurance or voluntary acquiescence. Slight evidence of an affirmative character might suffice to establish such connivance or acquiescence, but there must be some. "Noscitur a sociis" is an established rule in the interpretation of statutes. "Associated words are understood to be used in their cognate sense." There can be no doubt that the word "suffer" is here a synonym of "permit." It is the active and transitive verb, and not the intransitive. Its meaning as here used is that given by all lexicographers, Webster defining it thus: "(4) To allow; to permit; not to forbid or hinder; to tolerate. 'I suffer them to enter and possess.' Milton." Worcester gives as one of the meanings: "(3) To allow; to admit; to permit. 'God is faithful, who will not suffer you to be tempted above that ye are able.' I Cor. x. 13." The Century gives as one meaning of the word: "To refrain from hindering; allow; permit; tolerate. 'Suffer the little children to come unto me, and forbid them not.' Mark, x. 14." There can be no doubt, then, that "suffer" or "permit," as used in this section, denotes a voluntary act of the debtor. They do not denote or describe acts of the creditor. The debtor must by this act consciously and voluntarily in some degree co-operate with the creditor in "obtaining" the preference. He cannot suffer or permit what he cannot hinder. A preference obtained under such circumstances is not his act, and the consequence of bankruptcy, as denounced in this section, attaches only to his act. In the case before us, Sallie E. Duncan, the debtor, undoubtedly, to use the language of the district court for the Western district of Wisconsin in Re Nelson, 98 Fed. 76, "had a right to give a note, with warrant of attorney, so long before the bankrupt law was passed; and, having given it upon good consideration, it was not in [her] power to prevent the entry of a judgment against [her]. What was not in [her] power to prevent, [she] could hardly be said to have suffered or procured."

It seems to us that the learned judge in the court below, in the instruction to the jury above quoted, has entirely failed to give force and effect to the plain English words of section 3 of the bankrupt act just commented on. He in fact makes the act of bankruptcy consist entirely of the debtor not vacating or discharging a preference, however obtained, whereas in this third clause of the third section the act of bankruptcy is made to consist of the voluntary act connoted by "suffer" or "permit," as already explained, coupled with the failure of the debtor to vacate or discharge within five days, etc., the preference thus suffered or permitted; the plain and obvious meaning of this clause being that, even though the debtor has suffered or permitted a preference to be obtained, it still will not be considered an act of bankruptcy, if within the five days, etc., he "vacates or discharges" the same. In making this contention that the failure of the debtor to vacate or discharge a preference, how-

106 F.—54

ever obtained, constitutes an act of bankruptcy, the appellees seem to admit that the failure spoken of in the act means omitting to do something which the debtor was able to do; for when it is pointed out that a judgment from which a preference results has been obtained upon a valid cause of action, that there was no legal defense, that it was regularly entered and no exception was possible to its record, and that the debtor was not able to discharge it by payment, the reply is made, not that it is a matter of no consequence whether he was able to do any of these things, or not, but another thing, which he unquestionably is able to accomplish, is mentioned, viz. voluntary bankruptcy. This reply is made upon the authority of several cases in the district courts, one of them stating the matter thus:

"If neither of these weapons is available, he has still at command one sufficient weapon, of which he cannot be deprived: He can apply promptly to the court of bankruptcy, and ask that his property shall be ratably divided among his creditors. If he fails to move, his inaction is properly regarded as a confession that he is hopelessly insolvent, and as conclusive proof that he consents to the preference that he has declined to strike down."

It may be remarked in passing that in the case of a corporation the "weapon" of voluntary bankruptcy is not available.

There is in the language above quoted the implication of a further, somewhat inconsistent, admission that, in view of the natural and ordinary meaning of the words "suffer or permit," there was a necessity to seek for some evidence of the exercise of the debtor's will; and this, it is asserted, is found in the debtor's failure to voluntarily ask to be declared a bankrupt, in order to vacate or discharge the preference obtained, in cases where no other way of discharging such preference is open to him. If the element of the debtor's will be necessary to the "vacating or discharging" of the preference, it is hard to see why it should be taken away from the words "suffer or permit," as used in the former part of the clause under consideration. It would be more consistent to eliminate it in both cases. The construction of clause 3, according to the contention of the appellees, would then be that the bankruptcy of the debtor has no relation to his act, but depends alone upon the result and effect of the creditor's act in obtaining a preference, and likewise upon the result or effect of the preference not having been discharged by the debtor, irrespective of his ability to so discharge the same. But, as already explained, the appellees admit the necessity of importing the will of the debtor into the failure to discharge or vacate, by the suggestion that, if there are no other means to legally vacate or discharge the preference, still it is open to him to exercise his volition to become a voluntary bankrupt. As we cannot hold the debtor as for a duty to "vacate or discharge," where he has no ability to do either, so as to avoid the consequence of bankruptcy, no more can we hold that he "suffered or permitted" the obtaining of a preference which he could not legally have hindered or prevented. In its last analysis, the contention of the appellees, and of those decisions which support their contention, is

that the failure of the debtor to promptly apply to the court to be declared a voluntary bankrupt, and so effect an equal distribution of his property among his creditors, is conclusive evidence of his having "suffered or permitted" the obtaining of a preference referred to in the act, no matter how impossible legal resistance on his part to such preference may have been, and no matter how incapable he may have been to "vacate or discharge" the preference so obtained, otherwise than by his voluntary bankruptcy. This seems to us an unwarranted, as well as a harsh, interpretation of the section under consideration, justified neither by the language employed nor the scope or intent of the act itself, as gathered from its consideration as a whole. It is a begging of the question of bankruptcy, inasmuch as it requires that a preference once obtained by a creditor, even in invitum as to the debtor, should fix the status of such debtor as a bankrupt, either by the involuntary or by a so-called voluntary proceeding. We do not think it could have been meant in this act, any more than in the act of 1867, to put a compulsion upon the debtor to apply to be declared a bankrupt. The language of the supreme court in Wilson v. Bank, 17 Wall. 473, 21 L. Ed. 723, as to this proposition, is as applicable to the present act as it was to the bankrupt act of 1867. It is true that in the act of 1898 and in the clause under consideration it was expressly provided that, even though a preference has been "suffered or permitted," it shall not be an act of bankruptcy, if the debtor vacates or discharges the same within a certain time, and that there is no express provision of this kind in the act of 1867. But neither in the existing act nor in the act of 1867 is there any express provision making it the legal duty of the insolvent, when sued by one creditor in a proceeding likely to end in a judgment and seizure of property, to file himself a petition in bankruptcy; nor is this duty to be inferred from the scope of the act or the spirit of the law, nor is it essential to its successful operation in the one case more than in the other. Mr. Justice Miller, in the case of Wilson v. Bank, above referred to, in delivering the opinion of the court, says upon this point:

"We have already said that there is no moral obligation on the part of the insolvent to do this, unless the statute requires it, and then only because it is a duty imposed by the law. It is equally clear that there is no such duty imposed by that act in express terms. * * * As before remarked, the voluntary clause is wholly voluntary. No intimation is given that the bankrupt must file a petition under any circumstances. While his right to do so is without any other limit than his own sworn averment that he is unable to pay all his debts, there is not a word from which we can infer any legal obligation on him to do so. Such an obligation would take from the right the character of a privilege, and confer on it that of a burdensome and often ruinous duty. It is, in its essence, involuntary bankruptcy. But the initiation in this kind of bankruptcy is by the statute given to the creditor, and is not imposed on the debtor. And it is only given to the creditor in a limited class of cases."

Though the act of 1867, in its corresponding provision, which is section 39 of the act, speaks of the "procuring or suffering" by the debtor of his property to be taken on legal process, with intent to give a preference, etc., we do not think the reasoning of the supreme

court above quoted, in regard to the alleged duty or necessity for
the debtor to take proceedings to be declared a voluntary bankrupt,
can be claimed to be at all affected by this difference between the
two acts, but is, as we have said, as applicable under the one as the
other.

We conclude, then, both upon reason and authority, that there
is no duty imposed upon the debtor to file a voluntary petition in
bankruptcy for the purpose of discharging a preference, however ob-
tained, where no other way of doing so is open to him, and that his
mere failure to file such a petition will not warrant an inference
either that he is hopelessly insolvent, or that he consents to the
preference which his creditor has obtained.  There is no such con-
tradiction of terms involved in the practical administration of the
bankrupt act.  The failure to vacate or discharge, as mentioned in
the act, means, evidently, a failure to do something which would re-
lieve the debtor from the consequence of his act, in having "suffered
or permitted," etc., and not a failure to do something which would
only anticipate those consequences.  The section in the act of 1867
defining acts of bankruptcy, and corresponding to section 3 of the
present act, is section 39, and the provision analogous to clause 3
of section 3 reads as follows:

"Sec. 39. That any person residing and owing debts, as aforesaid, who,
after the passage of this act shall  *  *  *  procure or suffer his property
to be taken on legal process, with intent to give a preference to one or more
of his creditors,  *  *  *  shall be adjudged a bankrupt on the petition of
one or more of his creditors  *  *  *.  provided such petition is brought
within six months after the act of bankruptcy shall have been committed."

Without laying too much stress on the distinction, it is to be ob-
served that the action of the debtor, as described in this section,
is the procuring or suffering his property to be taken on legal pro-
cess.  This denotes in itself a complete act of the debtor, and it
was necessary to limit its universality by attaching to it the specific
intent to give a preference, etc., as clearly there may have been on
the part of the debtor a procuring or suffering of legal proceed-
ings that had no reference to or bearing upon the preference of a
creditor.  In clause 3 of the present act, however, as already quoted,
the act of "suffering or permitting" goes at once to the preference
of creditors, and there is no necessity of such a limitation of the
act as is contained in the bankrupt law of 1867.  To suffer or per-
mit a preference implies an intentional act on the part of the
debtor.  The coupling of the specific intent as to a preference to the
act of procuring or suffering a judgment, etc., in the act of 1867,
does not make such an intent more necessary than do the words
"suffer or permit a preference" in the present act.  While the act
of 1867 requires a specific intent on the part of the debtor to give
a preference, in order that an act of bankruptcy may be established,
the act of 1898 no less involves an intent on his part that a prefer-
ence should be obtained.  Any voluntary procurance or connivance,
as connoted by the words "suffer or permit," on the part of the debtor
in the obtaining by a creditor of a preference, is the equivalent of

an obtaining of a lien with intent on the part of the debtor to give
a preference. In each case the intent must exist, even though, as
already stated, slight evidence may suffice in the former case. In
other words, the provisions of the two acts, though differently
framed, are in this regard substantially the same. To hold other-
wise would be as absurd as to claim that there was a substantial
difference, in the matter of intent, between saying, for instance,
that an offense shall consist in a man's raising his hand within strik-
ing distance, with the intent to commit an assault upon another,
and saying that it shall consist in committing an assault by so rais-
ing his hand. In delivering the opinion of the supreme court in
the case of Wilson v. Bank, referred to in another connection, Mr.
Justice Miller, of course, dwelt upon the express qualification of in-
tent with which the act of procuring or suffering one's property to
be taken on legal process, etc., was necessarily coupled. Bearing
what has just been said in mind, the reasoning of that case will
apply to the present one. It is true that the case before the supreme
court did not involve the question whether the party was rightfully
declared a bankrupt, but arose under the thirty-fifth section of the act
of 1867, which declares void certain acts of the debtor, which were
done "with a view to give a preference" to a creditor. The language
of this section, so far as we are concerned with it now, is that if
any person, being insolvent, etc., within four months of filing a
petition by or against him, "with a view to give a preference to
any creditor, * * * procures any part of his property to be
attached, sequestered, or seized on execution, * * * the same
shall be void." Here, as in the thirty-ninth section, above referred
to, the act of "procuring" relates to the attaching of the debtor's
property, and not directly to the obtaining or giving a preference.
The act is qualified by the words "with a view to give a preference,"
etc. The qualification of the act by the specification of the intent
is therefore necessary in both sections of the old act. In consid-
ering the question under the thirty-fifth section, Mr. Justice Miller
construes it together with the thirty-ninth section, and uses this lan-
guage:

"The thirty-fifth section of the act, which is designed to prevent fraudulent
preferences of a person in contemplation of insolvency or bankruptcy, de-
clares that any attachment or seizure under execution of such person's prop-
erty, procured by him with a view to give such a preference, shall be void if
the act be done within four months preceding the filing of the petition in
bankruptcy by or against him. Though the main purpose of the thirty-ninth
section is to define acts of the trader which make him a bankrupt, and
that of the thirty-fifth is to prevent preferences by an insolvent debtor in
view of bankruptcy, both of them have the common purpose of making such
preferences void, and enabling the assignee of the bankrupt to recover the
property; and both of them make this to depend on the intent with which
the act was done by the bankrupt, and the knowledge of the bankrupt's
insolvent condition by the other party to the transaction. Both of them
describe, substantially, the same acts of payment, transfer, or seizure of
property so declared void. It is therefore very strongly to be inferred that
the act of suffering the debtor's property to be taken on legal process in
section 39 is precisely the same as procuring it to be attached or seized on
execution in section 35. Indeed, the words 'procure' and 'suffer' are both
used in section 39."

If the express specification of the intent to give a preference, with which the act of procuring or suffering property to be taken in execution is limited, is equivalent to the intention implied in the words "to suffer or permit a preference to be obtained," as we think it is, then the reasoning of the supreme court in the case of Wilson v. Bank is applicable and authoritative in the present case, and the following language of Mr. Justice Miller must be considered:

"The facts of the case before us do not show any positive or affirmative act of the debtors from which such intent may be inferred. Through the whole of the legal proceedings against them they remained perfectly passive. They owed a debt which they were unable to pay when it became due. The creditor sued them and recovered judgment, and levied execution on their property. They afforded him no facilities to do this, and they interposed no hindrance. It is not pretended that any positive evidence exists of a wish or design on their part to give this creditor a preference, or oppose or delay the operation of the bankrupt act. There is nothing morally wrong in their course in this matter. They were sued for a just debt. They had no defense to it, and they made none. To have made an effort by dilatory or false pleas to delay a judgment in the state court would have been a moral wrong. and a fraud upon the due administration of the law. There was no obligation on them to do this, either in law or in ethics. Any other creditor whose debt was due could have sued as well as this one, and any of them could have instituted compulsory bankrupt proceedings. The debtor neither hindered nor facilitated any one of them. How is it possible from this to infer, logically, an actual purpose to prefer one creditor to another, or to hinder or delay the operation of the bankrupt act?"

The following language in the same opinion is also pertinent:

"The general legal proposition is true, that where a person does a positive act, the consequences of which he knows beforehand, then he must be held to intend those consequences. But it cannot be inferred that a man intends, in the sense of desiring, promoting, or procuring it, a result of other persons' acts, when he contributes nothing to their success or completion, and is under no legal or moral obligation to hinder or prevent them. Argument confirmatory of these views may be seen in the fact that all the other acts or modes of preference of creditors found in both the sections we have mentioned, in direct context with the one under consideration, are of a positive and affirmative character, and are evidences of an active desire or wish to prefer one creditor to others. Why, then, should a passive indifference and inaction, where no action is required by positive law or good morals, be construed into such a preference as the law forbids? The construction thus contended for is, in our opinion, not justified by the words of either of the sections referred to, and can only be sustained by imputing to the general scope of the bankrupt act a harsh and illiberal purpose, at variance with its true spirit and with the policy which prompted its enactment."

This case was followed in the supreme court by the case of Clark v. Iselin, 21 Wall. 360, 22 L. Ed. 568, in which the question arose under the 35th section of the act of 1867. It was a suit by an assignee in bankruptcy to recover certain assets which the bill charged were made over to the defendants in fraud of the bankrupt law. The court, by an opinion delivered by Mr. Justice Strong, confined itself to the construction of this thirty-fifth section, which, as we have seen above, provides for the making void of certain acts of the debtor done by him with the view to give a preference, etc., but, as we have seen in the prior case of Wilson v. Bank, the same construction is to be applied to both the thirty-fifth and the thirty-ninth sections of the act. Although the word "procure," in this thirty-fifth

section of the act of 1867, is somewhat stronger than the "permit or suffer," in the third section of the present act, it is only a matter of degree, and does not at all affect the argument or conclusion arrived at. In considering the meaning and effect to be given to the language of this section, the supreme court say:

"Now, in a case where a creditor, holding a confession of judgment perfectly lawful when it was given, causes the judgment to be entered of record, how can it be said the debtor procures the entry at the time it is made? It is true, the judgment is entered in virtue of his authority,—an authority given when the confession was signed. That may have been years before, or, if not, it may have been when the debtor was perfectly solvent. But no consent is given when the entry is made, where the confession becomes an actual judgment, and when the preference, if it be a preference, is obtained. The debtor has nothing to do with the entry. As to that he is entirely passive. Ordinarily he knows nothing of it, and he could not prevent it if he would. It is impossible, therefore, to maintain that such a judgment is obtained by him when his confession is placed on record. Such an assertion, if made, must rest on a mere fiction. And so it has been decided by the supreme court of Pennsylvania."

That the court here was dealing alone with the meaning of the word "procure," or "procure or suffer," and not with the provision referring to a specific intent, is shown by the fact that the court introduced a discussion of this provision of the statute by immediately saying, after what has been quoted above:

"More than this, as we have seen, in order to make a judgment and execution against an insolvent debtor a preference fraudulent under the law, the debtor must have procured them with a view or intent to give a preference."

The construction in this regard of the act of 1867 previously given by the district courts was entirely overthrown and reversed by the supreme court in this and other cases. Under the present act the decisions of the district courts have been in line with the holding of the court below in this case, upon the assumption that these decisions of the supreme court turned upon the proposition that intent was essential under the act of 1867, and upon the further assumption that intent was not essential under the act of 1898. To this, with the utmost respect for the courts so deciding, we cannot agree. If it had been the intention of congress, in framing the present law, to make the mere obtaining by a creditor of a preference by judicial proceedings, apart from any exercise of the will or action of the debtor, work the bankruptcy of the latter, it could easily have been done by using fewer words than have been used. They would not have spoken of acts of bankruptcy by the debtor at all. They would have omitted the words "suffered or permitted," as denoting an action of the debtor, and have merely provided that any obtaining by a creditor of a preference by means of judicial proceedings against a debtor should result in his being declared a bankrupt. This was actually accomplished in the late English and Canadian acts, but it was accomplished by express and unequivocal language, which left nothing to construction. The English act of 1896, referred to, is in this regard as follows:

"A debtor commits an act of bankruptcy if execution against him has been levied by seizure of his goods, under process, in any action in any court, or

in any civil proceeding in the high court, and the goods have been either sold or held by the sheriff for twenty-one days."

To hold that the present act has done this, even to give effect to a supposed general policy of the law, in face of the clear and easily understood meaning of the language employed, would be, in our opinion, nothing short of judicial legislation. The construction of clause 3 of section 3 contended for by the appellees is so harsh in its consequences that we are unable to believe that it represents the will of congress. Under that construction a person while solvent may give a judgment bond for full and bona fide consideration, and years thereafter, becoming insolvent and being temporarily abroad, judgment may be entered against him, and his property levied on, without the slightest knowledge or suspicion on his part; yet, because he fails to have the lien of the execution vacated or discharged at' least five days before a sale or final disposition of the property levied on, he can be forced into involuntary bankruptcy. In such case the bankrupt act would either require the debtor to perform an impossibility to avoid bankruptcy, or cause him to be adjudged. a bankrupt practically and substantially on the ground of his insolvency alone, which is only one of the several elements or conditions required by the bankrupt act to co-exist before he can legally be adjudicated a bankrupt.

Aside from the reasons heretofore given in support of the conclusion we have reached, the act discloses on its face certain expressions strongly suggestive of the will of the debtor as involved in the suffering or permitting a creditor to obtain a preference. We find language which must be deemed to have been used on the assumption that the act of bankruptcy cannot wholly consist of the act of the creditor, but must include an act, whether by way of positive procurement or of connivance, on the part of the debtor, which will justify an adjudication of his having committed an act of bankruptcy. Thus, in section 19 it is provided that "a person against whom an involuntary petition has been filed, shall be entitled to have a trial by jury, with respect to the question of his insolvency, * * * and any act of bankruptcy alleged in such petition to have been committed," etc. This provision seems to require the commission of an act by the alleged bankrupt, and not merely passivity or inaction on his part. So in section 60, cl. "a," it is provided that "a person shall be deemed to have given a preference if being insolvent, he has procured or suffered a judgment to be entered against himself," etc. Thus, while this section deals with the treatment of preferences, it may fairly be inferred that the procuring or suffering by a debtor of a judgment to be entered, when the effect of its enforcement will be "to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class," was treated by congress as giving a preference, which involves a voluntary act on the part of the debtor. Section 67, cl. "f," is as follows:

"That all levies, judgments, attachments, or other liens, obtained through legal proceedings against a person who is insolvent, at any time within four months prior .to the filing of a petition in bankruptcy against him, shall be

deemed null and void in case he is adjudged a bankrupt and the property affected by the levy, judgment, attachment, or other lien shall be deemed wholly discharged and released from the same," etc.

This clause provides for making invalid liens obtained through legal proceedings against an insolvent person, within four months of the filing of the petition, on which the debtor is adjudged a bankrupt. It does not relate to acts of bankruptcy, but is predicated upon the fact that an adjudication of bankruptcy has intervened, and the status of the bankrupt and of his estate have become established. It by no means follows that the obtaining of any of the liens referred to in clause "f" involves an act of bankruptcy. A lien obtained through legal proceedings, denounced by clause "f," may not have been "suffered or permitted," within the meaning of section 3. If congress intended by the words "suffered" and "permitted," or either of them, mere passivity or inaction, it is somewhat remarkable that they were employed instead of the simpler phrase "obtained through legal proceedings," as used in section 67, cl. "f." The distinction in meaning between the words "suffered and permitted," as used in section 3, and the word "obtained," as used in section 67, cl. "f," is not only evident, but has been clearly recognized judicially. In re Richards, 96 Fed. 935, 37 C. C. A. 634, decided by the circuit court of appeals for the Seventh circuit, it appeared that a judgment note was given by a debtor ten months before he became a voluntary bankrupt, and that judgment on the note was entered within four months of the filing of the petition in bankruptcy, and a levy made upon the property of the debtor. The case related to the validity of the preference thus obtained in violation of section 67, cl. "f." In the course of a carefully prepared opinion the court recognized the distinction above referred to, saying while treating of the relation of clause "c" to clause "f" of section 67:

"But subdivision 'f' is broader in its scope, and avoids all liens obtained through legal proceedings within the time stated against a person who is insolvent within the meaning of the subdivision, irrespective of knowledge on the part of the creditor of the fact of insolvency, and irrespective of the question whether the obtaining of the lien was in any way suffered and permitted by the debtor. * * * We are of opinion, therefore, under the rule stated, corroborated and justified by the action of congress, that the provisions of subdivision 'f' must prevail over those of subdivision 'c,' and that all liens obtained through legal proceedings within the time stated against a person who is insolvent, and irrespective of any sufferance or permission thereof by the debtor and of any knowledge by the creditor of the debtor's insolvency, are avoided if that subdivision can be held to apply to voluntary proceedings in bankruptcy, and if another objection hereinafter considered is unavailing. * * * The validity of the lien depends upon the terms of the act speaking to that subject, but not upon the question whether the acts which resulted in the lien were acts which subjected the debtor to proceedings in bankruptcy. It is doubtless true that the debtor could not have been forced into bankruptcy because of the acts done by him; but, under the law, when for any reason bankruptcy has supervened, and adjudication has been determined by the court, all liens which fall under the ban of section 67 are avoided, whether the debtor has been or could have been adjudicated a bankrupt for his acts with reference to any specific lien."

We have quoted at length from the foregoing opinion for the reason that the court has clearly emphasized and set forth the con-

trast between the provision made in section 67, cl. "f," of the act, making void certain liens obtained by a creditor, and the provision in regard to what acts of a debtor shall be followed by the consequences of bankruptcy. When it was desired to render liens obtained by a creditor under judicial proceedings against the property of his debtor void, under certain circumstances, without reference to any voluntary act of the debtor, congress had no difficulty in finding appropriate language to express its meaning, just as the English act above quoted used appropriate and unequivocal language to define the things which, being done by the creditor, should work the bankruptcy of the debtor, without requiring any act on his part.

In the view that we have been compelled to take of this third clause of the third section of the present act, the instruction given to the jury by the court below, and above quoted, constitutes reversible error. It is proper, however, that we should consider other assignments of error, founded upon exceptions to rulings and to the charge of the court below. Section 1, cl. 15, of the bankrupt act of 1898 provides:

"A person shall be deemed insolvent within the provisions of this act, whenever the aggregate of his property * * * shall not, at a fair valuation, be sufficient in amount to pay his debts."

This is a statutory definition of insolvency, and differs somewhat from the ordinary and popular definition, and must be strictly adhered to. The court, in commenting to the jury upon this definition, proceeds to instruct them as follows:

"The question then for you to determine was whether the aggregate of her property was or was not sufficient, at a fair valuation, to pay the amount of her debts. Now, gentlemen, what a fair valuation is, under the provisions of this act, seems to me to be this: The law contemplates that, where a man has property of his own which is sufficient for him to realize from and meet his obligations, he is solvent; and it is only when that cannot be done that the law will proceed to liquidate that property, turn it into cash, and pay off his indebtedness. * * * Now, we think that the fair criterion of the value of that stock was what it would have brought from a purchaser who desired a stock of that kind at that time. Now, if that stock would have brought sufficient to pay all the indebtedness,—to meet all these obligations,—then it is quite evident that Mrs. Duncan was not insolvent. *But if, under her situation, and the number and amounts of obligations owing by her, the time when they were due, which, of course, are elements regarded by the purchaser of property,—if, under all these circumstances* (even if a purchaser had been found who wanted the stock for the price, and who acted in fairness and with due regard and consideration for the value of the property), the stock would not have appeared sufficient to pay off this indebtedness, then she was insolvent, under the act, and your verdict should be to that effect."

We think the learned judge of the court below, in thus charging, gave to the jury an erroneous impression as to how a "fair valuation" of the property of the debtor was to be arrived at. We think that the present market value of the property in question would be a fair valuation of the same, but there is nothing in this section of the act that authorizes that market value to be ascertained by what a purchaser would give who desired to take advantage of the necessities and embarrassments of the owner, in order to procure

the same at a price less than its real or market value. We think the words above quoted from the charge of the court below which we have italicized have no place in an explanation of what is the criterion of a fair valuation. Lawrence v. City of Boston, 119 Mass. 126; Dwight v. Commissioners, 11 Cush. 201; Railroad Co. v. Doughty, 22 N. J. Law, 495; Murray v. Stanton, 99 Mass. 348. Again, the act expressly says that a man shall be deemed insolvent only when the aggregate of his property, at a fair valuation, shall not be sufficient to pay his debts; but the court below gives an unwarranted construction to this definition, by adding to the plain meaning of a "fair valuation" the requirement that the debtor must be able to realize from his property a sufficient amount to pay his debts. This seems to us to clearly depart from the plain requirements of the statute, by adding a condition not therein set forth. A man's property, at a fair valuation, may amount to sufficient to pay his debts, although he might not be able to realize at once the amount of that valuation. In these two respects, we think the charge of the court, under this provision of the statute, misleading, and calculated to place the debtor in a harder situation than was intended by the statute.

Another question embraced in the assignments of error, and arising out of the exceptions to the admission of testimony as to the statements made by the husband of Sallie E. Duncan bearing on the inquiry as to her insolvency, should be adverted to. It appears from the testimony contained in the record that James M. Duncan, the husband of the alleged bankrupt, was the general manager of her department store. There was no written authority or power of attorney conferring this general agency or defining its scope. The power of attorney produced in evidence was a special one, and was confined to authorizing the husband to sign and indorse commercial paper in the name and behalf of his wife. Several witnesses were admitted, over objection, to testify to statements made to them by James M. Duncan, not in the presence of his wife, which were claimed to be in the nature of admissions of, or as tending to prove, the insolvency of Sallie E. Duncan. This testimony was, as has been already stated, in substance, that the witnesses, as attorneys of different parties, called at various times at the department store, on James M. Duncan, to demand payment of overdue accounts of their several clients; that the said Duncan expressed his inability to pay the accounts at the time, and said that, if she was pressed, others would do likewise, and it might or would result in the store being closed. To one or more, he added the statement that, with time, the accounts would be paid. An act of congress embodied in section 858 of the Revised Statutes, after prescribing rules as to the competency of certain witnesses and testimony, provides that:

"In all other respects, the laws of the state in which the court is held shall be the rules of decision as to the competency of witnesses in the courts of the United States in trials at common law, and in equity and admiralty."

We are therefore properly referred to the act of assembly of the commonwealth of Pennsylvania of May 23, 1887 (P. L. p. 158, § 5), which is as follows:

"Nor shall husband and wife be competent or permitted to testify against each other. except in those proceedings for divorce in which personal service of the subpœna or of a rule to take depositions has been made upon the opposite party, or in which the opposite party appears and defends, in which case either may testify fully against the other, and except also in any proceedings for divorce either party may be called merely to prove the fact of marriage."

The incompetency of husband and wife to testify against each other had been the policy of the law of Pennsylvania prior to this enactment, as evidenced by frequent judicial decisions of her highest courts. The language of this statute is positive and peremptory, and is emphasized by the single exception which relates exclusively to actions for divorce. Clearly the testimony as to the statements of the husband of Sallie E. Duncan, admitted by the court below, came within the inhibition of this provision of the law of Pennsylvania. If the law does not permit the direct testimony of the husband against his wife, a fortiori it cannot permit his indirect testimony against her. It is nevertheless contended by the appellees that the testimony as to the statements of the husband, in question, does not come within the meaning of the statute, because the husband was acting as his wife's agent, and his declarations were part of the res gestæ. The reason for claiming such an exemption from this positive rule of law, presumably, is that the wife, by constituting her husband her agent, has consented that his declarations, made within the scope of his authority, shall bind her, and therefore are not within the purview of the statute. No decision of the courts of Pennsylvania establishing such a proposition in the face of the plain words of this provision has been cited to us. Cases decided before the statute do not sufficiently meet the situation. Admitting, however, for the sake of the argument, that the contention of the appellees above stated is sound, we are of opinion that the statements of James M. Duncan as disclosed in the record, and above referred to, were not within the scope of his authority as general manager of the department store for his wife. We may concede that his authority as such general manager extended to the buying and selling of the goods pertaining to the business of such a store, and that his wife would be bound by his relevant statements to one from whom he was buying or to one to whom he was selling, or by those made to her employés about their contract of service, etc. But the declarations here testified to are not of this kind. They were not part of the res gestæ of any business which his wife had, by any rational construction of the scope of his agency, committed to him to transact. He was not speaking in the course of a negotiation to buy or to sell on her behalf. The accounts for the goods he had bought had matured and were overdue, and the business of his agency, as far as these creditors were concerned, was closed. We think, therefore, that the testimony as to James M. Duncan's statements above referred to was inadmissible. For the reasons stated, the judgment of the court below is reversed, and a venire de novo awarded.

DALLAS, Circuit Judge. I concur in the conclusion arrived at in this case, but not in the construction put by the majority of the

court upon clause 3 of section 3 of the bankruptcy act of 1898.     The reasons for this dissent may be briefly stated, and need not be elaborated.     I do not think that any special significance should be ascribed to the word "acts," as it occurs in section 3.     What was intended, as I believe, was merely to designate what conduct of a person would have the effect of making him a bankrupt.     The word "acts" is certainly sometimes used as an equivalent for the word "behaves," even where the behavior referred to is not positive, but negative, in character, as where it is said that a man acts unreasonably in not doing something which in reason he ought to do. In the corresponding section of the bankrupt act of 1867 it was unquestionably so used, and I perceive no ground for supposing that in the act of 1898 it was employed in a narrower sense.     By section 39 of the act of 1867 it was provided, among other things, that any person "who has been arrested and held in custody under or by virtue of mesne process,     *     *     *     and such process is remaining in force and not discharged by payment;     *     *     *     or has been actually imprisoned,     *     *     *     shall be deemed to have committed an act of bankruptcy."     Here, then, we find that under the act of 1867 an act of bankruptcy might consist of the debtor's arrest or imprisonment, which, of course, could not be his own act, and that, by his not doing,—not paying,—the act of bankruptcy constituted by his arrest would be consummated and established.     Hence it appears that congress in the previous statute provided that certain acts, not of the debtor himself, should be deemed to be acts of bankruptcy committed by him; and I therefore cannot agree that, by reason of the association in the present act of the same phrase—"acts of bankruptcy"—with the words "suffered or permitted," these words must be interpreted to mean connivance, co-operation, or participation, and nothing else besides.     Neither can I agree that the words "suffered or permitted" necessarily import positive action.     They may do so, it is true; but they also, and I think ordinarily (especially when disjunctively presented), signify passive sufferance or quiescent allowance,—"not to forbid or hinder; to tolerate" (Webster); "to refrain from hindering; allow, permit; tolerate" (Century).     But there are considerations which, in my opinion, should have greater weight in the construction of this clause than any nice discrimination of the diverse definitions of particular words. The cases of Wilson v. Bank and Clark v. Iselin were decided under the act of 1867, and, with those decisions and that act presumably in mind, the act of 1898 was passed, with provisions which, as respects the matter in question, notably differ from those of the act of 1867.     The word "procure," which was in that act, and which might well be said to indicate that positive action on the part of the debtor was contemplated, was pointedly omitted from the act of 1898; and to the word "suffered" there was added the words "or permitted," with, as I think, the evident intention of making it clear that procurement would not be necessary, but that mere sufferance or allowance would be enough, to occasion bankruptcy. Moreover, clause 3 of section 3 of the act of 1898 does not include the provisions of the act of 1867 with reference to the debtor's

intent, or anything whatever upon that subject; and this departure, I think, shows that the object in view was not merely to impose bankruptcy upon the debtor because he had given a preference, but was to preclude, where possible, the acquisition of any advantage of one creditor over others. Taken together, I cannot but regard these modifications as significant of a design to prevent the present statute from being construed as the former one had been. It cannot be supposed that such suggestive changes in their otherwise similar terms were made without purpose, and to me it is manifest that the intention in making them was to establish as the law of 1898—no matter what that of 1867 might have been—that, if an insolvent (regardless of intent or procurement) either suffered or permitted any creditor to obtain a preference, his failure to vacate it within the time limited would be an act of bankruptcy; and this understanding is accordant with the general policy of the act, to which allusion has been made, that no creditor shall be, either by procurement or sufferance, enabled "to obtain a greater percentage of his debt than any other of such creditors of the same class." Section 60. The decisions of the district courts in other circuits as well as in this one are in harmony with the views I have expressed. Those decisions are, of course, not binding upon us, but they are entitled to much weight; and, in my opinion, the construction which has heretofore uniformly been given to the clause under consideration ought not now to be discarded in this jurisdiction.