### In re HINES.

(District Court, D. Oregon. February 5, 1906.)

No. 901.

**1. BANKRUPTCY—ACT OF BANKRUPTCY—PROOF OF INSOLVENCY.**

In determining whether or not a debtor was insolvent, within the meaning of Bankr. Act July 1, 1898, c. 541, § 1, subd. 15, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419], at the time of the commission of an alleged act of bankruptcy by suffering a creditor to obtain a preference through legal proceedings, the test of a "fair valuation" of his property is its market value at the time the legal proceedings were taken, where that can be fairly established, and not its value as it may have been affected by such proceedings; and the property to be taken into consideration includes all of his property, whether legally exempt from execution or not, except such as may have been conveyed, concealed, or removed with intent to defraud, hinder, or delay his creditors.

**2. SAME.**

Evidence considered, and *held* insufficient to establish the insolvency of a defendant at the time of the commission of an alleged act of bankruptcy, but, on the contrary, to show that his property at a fair valuation exceeded his indebtedness.

In Bankruptcy.

Several creditors of S. E. Hines, of North Bend, Coos county, Or., on January 25, 1905, filed their petition in court charging him with having committed an act of bankruptcy, in that, while insolvent, and on January 17, 1905, he suffered a judgment to be obtained against him in the sum of $2,030, upon which execution has been issued and certain property of defendant levied upon, and that defendant has not vacated or discharged the same. The defendant controverts these allegations, and avers that his property, at a fair valuation, is worth $3,000 in excess of his indebtedness or liabilities.

Bauer & Greene, for petitioners.
J. H. Guerry, for defendant.

WOLVERTON, District Judge. The single question presented by counsel for the creditors for consideration is: Was the defendant insolvent when the judgment was entered against him and levy made in pursuance of the execution issued thereon? If he was, he is guilty

of the act of bankruptcy charged; if not, the petition should be dismissed. In re Rome Planing Mill (D. C.) 96 Fed. 812.

By the first section (subdivision 15) of the bankruptcy act (Act July 1, 1898, c. 541, 30 Stat. 544 [U. S. Comp. St. 1901, p. 3419]. See Collier on Bankruptcy [4th Ed.] p. 2.) a person is deemed insolvent whenever the aggregate of his property, exclusive of any property that he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors, is not, at a fair valuation, sufficient in amount to pay his debts. As it respects property considered in a commercial sense, I can conceive of no better or surer standard by which to arrive at a fair valuation than the market value; that is, what the property will probably bring, or is worth in the general market, where everybody buys. It could not be what it is worth to one person or to another specially circumstanced, or having special use for a particular article, but what it is worth as a marketable commodity, at a given time, with no special conditions prevailing other than affect the market generally in the locality where the commodity is for sale. "We think," says Mr. Justice Gray, in an able and elaborate opinion rendered in the Circuit Court of Appeals for the Third Circuit, in the case of Duncan v. Landis, 106 Fed. 839, 858, 45 C. C. A. 666, 685, "that the present market value of the property in question would be a fair valuation of the same." See, also, In re Bloch, 109 Fed. 790, 48 C. C. A. 650, and In re Coddington (D. C.) 118 Fed. 281.

The intendment of the statute could scarcely be otherwise, giving the language employed its usual and natural significance. The difficulty is, and perhaps always will be, in arriving at the market value. Unless the commodity has a value quotable in the current markets of daily or frequent sales, there is much of opinion that enters into the estimate, and from this must be deduced the probable market value, and consequently, under the bankruptcy act, a fair valuation. Nor is such valuation affected by any depreciation of property consequent upon the recovery of judgment against the debtor and a levy thereunder. The language of the act is: "Having * * * suffered or permitted, while insolvent, any creditor to obtain a preference through legal proceedings," etc. (section 3, subd. 3, Bankr. Act [30 Stat. 546; U. S. Comp. St. 1901, p. 3422]; Collier on Bankruptcy [4th Ed.], p. 2, § 3, p. 27)—the intendment being that the insolvency must exist at the time of suffering the preference to be taken; for, if the debtor is solvent, it would be perfectly proper and legitimate for him to make any sort of preference that he might see fit. The fact of suffering the preference, therefore, unless it might be under circumstances indicating that he intended to hinder, delay, or defraud certain of his creditors, could not be permitted to affect the value of his assets. If such were the case, then a person, who was before perfectly solvent, might be rendered insolvent by an action, accompanied by an attachment, and his insolvency would depend upon whether he could pay his debts under the stress of the occasion, and not, under the simple inquiry prescribed by the bankruptcy act, whether the aggregate of his property, at a fair valuation, is sufficient in amount to pay his debts. Such is the rationale of the holding in Chicago Title

& Trust Co. v. Roebling's Sons Co. (C. C.) 107 Fed. 71. That was an action by the trustee to recover on account of a preference alleged to have been obtained by a creditor attaching the manufacturing plant of the debtor, together with raw materials in store. The attachment destroyed the value of the plant as a going concern, and impaired also the value of the materials. It therefore became material to determine whether the valuation should be according to the worth of the property prior or subsequent to such attachment, and the conclusion was that the prior worth was the appropriate standard by which to make the estimate; Kohlsaat, District Judge, saying:

"While I regret to be forced to the conclusion, yet I am of the opinion that, under the wording of the present bankruptcy act, and especially the proper interpretation of the words 'being insolvent,' such action on the part of a judgment creditor would not create a preference recoverable by the trustee under the terms of the act."

This decision, while not distinctly upon the point under discussion, is perfect in analogy, and its authority cannot be gainsaid. Nor should property exempt by the state law from execution be deducted from the debtor's assets in ascertaining whether they are, at a fair valuation, sufficient in amount to pay his debts. This has been directly decided in the case of In re Baumann (D. C.) 96 Fed. 946. The question came up on a construction of such subdivision 15, of section 1, of the bankruptcy act. Mr. Justice Hammond says, relative to the provision:

"This is probably as arbitrary a provision as is to be found in the statute. It was intended to wipe out, as with a sponge, all that confusion which is to be found in previous bankruptcy statutes and decisions as to the meaning of the word 'insolvency.' It had also the more comprehensive purpose of designating with absolute fixity the only class of persons upon whom the involuntary features of the bankruptcy statute should operate, namely, those whose property was not sufficient in amount to pay their debts. It does not proceed upon any theory that the debts will in fact be paid by the appropriation of the property to that end, nor upon the theory that as a matter of fact it is available for compulsory payment, but upon the theory that the defendant has sufficient property with which he may pay his debts if he chooses to do so. * * * Moreover the language of the above-quoted section is explicit. There is not the least ambiguity about its meaning. It leaves no room for any construction by implication or otherwise. Obviously, it was intended to give us a rule in mathematics, the terms of which are absolute."

So arguing, and in further consideration that the act has made one exception, and one only—that of property conveyed or concealed with intent to defraud—it was concluded that it was clearly not the intendment of Congress to make another exception in relation to exempt property. The reasoning of the learned justice is strong and cogent, and his conclusion irresistible. The language of the act is very plain, without ambiguity or double-meaning, and, when it is found that one exception is expressly made, it excludes, by almost absolute inference, a deduction that another was also intended, so that, upon a simple construction of the act, it is manifest that it was not the purpose or intendment of the lawgiver that exempt property should be deducted in ascertaining the amount of the debtor's property at a fair valuation. In this view of the law, I will now examine the facts as disclosed

by the evidence, to determine whether Hines was insolvent at the time the judgment was entered against him and levy made.

The property which Hines claims he owned consists of a stock of merchandise (the same that was levied upon); bills and accounts, and $350 in cash; lot 3, block 19, in the town of North Bend, upon which is situated a two-story building 38x70 feet, the lower floor being occupied by Hines as a storeroom; and lots 1, 2, and 3 in block 45, without improvement. The day following the levy, Hines, assisted by the sheriff and S. Bachy and J. W. Grout, took an inventory of the stock in the store, which footed up to $3,278.84. The original cost price, which was ascertained from the markings upon the different articles going to make up the stock, or from the bills of purchase where the marking could not be found, was made the basis of valuation. No allowance was made for shopworn goods, as it was said the stock was "not very old." Bachy and Grout concur with Hines as to the manner of taking the inventory. I am satisfied that it was fairly made upon the basis of the cost price to Hines when he purchased the goods in the first instance. Hines testifies that at the time of the attachment he had some bills that amounted to as much as $200; the amount set down being $250. He further states that he had $350 in cash, which also appears to have gotten into the inventory. This comprises the whole of his personal property.

Lot 3, block 19, upon which the store building is situated, is incumbered by a mortgage of $1,000. The value of this piece of realty is variously estimated by the witnesses, ranging from $3,000 to $4,500. The lot cost the defendant, on February 10, 1904, $1,000, excavation $300, and for construction of store building about $2,000—thus aggregating $3,300. As to lots 1, 2, and 3 of block 45, Hines testifies that he paid for them $200 each, or for the whole $600. These were valued by witnesses ranging from $800 to $1,050. Hines had made some improvement upon them, by way of clearing them in part of brush and timber, at a cost, he affirms, of about $100. Touching the value of the stock of merchandise, several witnesses testify that it is worth, at sheriff's sale, being under attachment, from 50 to 65 and 70 cents on the inventoried value; that it would not bring more than these figures at forced sale. Two witnesses, H. Lockhart and H. J. Edwards, testify to the value of the stock if disposed of in bulk, while the concern was in active operation. Lockhart says the discount to be allowed upon the invoice price "is a matter to be agreed upon between the buyer and seller; it depends upon the age of the stock and its condition, and the value of the business. Twenty-five per cent. is the maximum amount generally allowed in such cases; discount sometimes being greatly in excess of that." Edwards corroborates this view, and no one controverts it. It seems, therefore, that the probable marketable value of this stock of goods, being in good condition, that is, "not very old," if then sold in bulk, prior to attachment and while the venture was a going concern, would have approximated 75 per cent. of the invoice, or $2,459.13. Such an estimate is the only one reasonably deducible under the evidence. The value of the accounts or bills has not been proved. Hines says, in effect, they amounted to $200 or $250, but he gives no itemized state-

144 F.—10

ment thereof, nor any information whatever as to whether they are against solvent persons. He may have had the bills, perhaps did, but they may have been worthless. As to their value, he makes no suggestion or statement. The cash item must be admitted, although the testimony is meager as to that. The estimates of value placed on the store property were based, sometimes upon the estimated rental value (it not having been shown that any part of the building had been rented, except six of the upper rooms at $15 per month), and sometimes upon the witness' opinion of the value of real property in North Bend, without reference to any particular standard, as actual sales of property and the like. There appears to be no estimate by any witness of sale values in the market at the time of the attachment. Charles Windsor, cashier of the North Bend Bank, testifies that in his opinion the property was worth from $3,000 to $3,500. He was a witness for the defendant, and his statement approximates the original cost of the property to Hines—the purchase price of the lot and the cost of excavation and building. There is yet no evidence, however, that the property was worth in the market what it cost the owner. There is evidence that the value of property has increased since Hines purchased, but there is much that property values have been vacillating in range, and, while there is much uncertainty in the testimony from which to form an opinion, I am impelled to the conclusion that the cost value is approximately what the sale value was at the time of the judgment and levy, thus rating lot 3, block 19, at $3,300. It was probably not worth less than this.

As respects lots 1, 2, and 3, of block 45, it appears from developments in the testimony that Hines never acquired the legal title to them, nor is it very clear that he has such an equitable right as entitles him under any condition to the legal title. J. L. Simpson, of the Simpson Lumber Company, who at the time held the legal title to the lots in trust for the company, testifies that he sold the lots to Hines at $600; that the amount was included in a note given by Hines to the lumber company on settlement; and that the note is the same as sued on by Guerry. So that it appears that nothing was paid down on the lots, and this is shown by an account rendered by the lumber company to Hines at the time of the alleged settlement. When it was inquired whether Hines had a written contract for the purchase of the lots, neither he nor Simpson was sure that any such contract was ever executed, and none was or could be produced at the trial. This leaves nothing but possessory title and some improvements made upon the lots, by way of clearing them of brush and timber, upon which to base his right to the legal title. These are shadowy and not well established. Coupled therewith, it is, not entirely clear that Hines did not intend that the title to these lots should remain in doubtful validity until his creditors were appeased. Consequently, he is not entitled to have them included among his assets for the purpose of determining his solvency.

As to the remainder of his property, I find no purpose on his part to cover or conceal any part of it with a view to putting the same beyond the reach of his creditors. His entire property, therefore, to which he was entitled, at its fair valuation at the time of the judg-

ment, consists of stock of merchandise, $2,459.13; lot 3, block 19, North Bend, $3,300; and cash on hand, $350—aggregating $6,109.13. The defendant's schedule of indebtedness shows an aggregate of $5,867.78. To this schedule should be added accrued interest on mortgage, $20; to Wm. Cluff Company's demand, $1.94; to Fleischner, Mayer & Co.'s, $36.08; to Wellman Peck & Co.'s, $10.15; to Cahn Nickelsburg & Co.'s, $11.92—making a total of liabilities in the sum of $5,947.87. Hines' property, at a fair valuation, therefore, exceeded his liabilities by $161.26, at the time of the entry of the judgment and levy.

It follows that he was not insolvent, and the petition in bankruptcy should be dismissed; and such will be the order of the court.