The Plymouth Cordage Company, *a Corporation, et al.,*
v. J. A. Smith.

(Filed February 13, 1907.)

1. **BANKRUPTCY—Solvency—Property Included.** In a contested proceeding in involuntary bankruptcy, property exempt from execution should be included in determining the issue of the solvency of the respondent.

2. **SAME—Same.** A person is deemed to be insolvent, within the provisions of section 1, subdivision 15, of the bankruptcy act, whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed or permitted to be concealed, or removed, with intent to defraud hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts.

3. **SAME—Value of Property—Instructions.** An instruction which charges the jury that: "A fair valuation of the notes and accounts is the net sum that in your judgment, from all the evidence before you, could have been, with reasonable diligence, realized from the collection of such notes and accounts, within a reasonable time after October 31, 1901, and not the accounts as shown by their face, unless their face value was in fact their fair value", is a correct rule which to determine the fair valuation of this class of personal property.

(Syllabus by the Court.)

*Error from the District Court of Kingfisher County; before*
*Jno. H. Burford, Trial Judge.*

*Samuel Feller, P. S. Nagle, W. A. McCartney, Blake, Blake & Low,* and *Karnes, New & Krauthoff,* for plaintiff in error.

*J. C. Robberts, M. J. Kane* and *W. W. Noffsinger,* for defendant in error.

STATEMENT OF FACTS.

This was a proceeding commenced in the district court of Kingfisher county by the Plymouth Cordage Company, and other petitioning creditors of James A. Smith, to have him adjudged a bankrupt. The petition was filed and the proceeding commenced on October 31, 1901. It is alleged in the petition that the respondent within four months prior to the 31st day of October, 1901, committed certain acts of bankruptcy, and they ask that he be declared a bankrupt, that his property be placed in the hands of a trustee, and the proceeds distributed *pro rata* to all his creditors according to their several demands. The specific acts of bankruptcy alleged in the petition are as follows:

"First: That on or about the 21st day of October, 1901, the respondent did have on deposit to his credit, in the First National Bank of Lawton, Oklahoma, the sum of at least thirty-one ($3100.00) hundred dollars, and that on said date, with the intent to hinder, delay and defraud his creditors, the said J. A. Smith did convey, transfer, conceal, remove, and permit to be concealed and removed the said sum of $3100.00 by drawing a check in favor of William Schwarberg for the said sum of $3100.00, upon the First National Bank of Lawton, and that the said Schwarberg did on the same day deposit the proceeds of said check in the First National Bank of Okarche to the credit of Augusta Smith, the wife of J. A. Smith, he, the said J. A. Smith, being in no manner indebted to his wife at said time.

"Second: That said J. A. Smith did, on or about the 16th day of October, 1901, while insolvent, transfer to D. M. Osborne & Co., one of his creditors, certain notes and securities, the particulars of which are unknown to the petitioners, and that said transfer was made with the intent on the part

of Smith to prefer said D. M. Osborne & Co., over his other creditors of the same class.

"Third: That on or about the 16th day of October, 1901, the said Smith, while insolvent, did transfer to the Sattley Manufacturing Company, one of his creditors, certain promissory notes and other securities, the exact particulars of which these petitioning creditors are unable to give, and did also transfer to the Sattley Manufacturing Company certain goods, wares, and merchandise consisting of agricultural implements then situated in the store of Smith, at Kingfisher, Okla., with the intent on the part of him, the said Smith, to prefer the Sattley Manufacuring Company over his other creditors of the same class."

To each of these alleged acts of bankruptcy, the respondent Smith entered a specific denial, and also specifically alleged that at the times of the alleged acts of bankruptcy and on the 31st day of October, 1901, he was solvent.

Upon the issues thus joined, the cause was submitted to the jury and a verdict returned in favor of the defendant, and against the petitioning creditors, and judgment was entered accordingly. Motion for a new trial was filed within time, considered by the court and overruled, exception saved, and the case is brought here for review.

Opinion of the court by

HAINER, J.: The first error assigned and argued is that the court erred in holding that the respondent was entitled to include all his real and personal property which was exempt under the laws of Oklahoma, in determining his solvency or insolvency.

It is contended by the learned counsel for plaintiff in error, at great length, and with much earnestness, that ex-

empt property under the laws of Oklahoma should not be included as a part of the assets in determining the solvency or insolvency of the respondent, on the ground that the title to exempt property does not pass to the trustee, and cannot be subjected to the payment of the just debts of the creditors, and is not subject to be administered by the court as a part of the estate of the bankrupt.    Upon principle, there is a great deal of force to this argument, and no doubt it would appeal very strongly to the legislative branch of our national government, but unfortunately for the contention of counsel the statute, in our opinion, does not warrant such a construction being placed upon it.    It is clear, explicit, and free from doubt or ambiguity.

Sec. 1, subd. 15, 30 U. S. Stat. L., page 544, defines an insolvent person as follows:

"A person shall be deemed insolvent within the provisions of this act whenever the aggregate of his property, exclusive of any property which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed, or removed, with intent to defraud, hinder, or delay his creditors, shall not, at a fair valuation, be sufficient in amount to pay his debts."

It will thus be seen that congress has given us a clear definition of a person who shall be deemed insolvent, and in clear terms excludes any property "which he may have conveyed, transferred, concealed, or removed, or permitted to be concealed or removed, with intent to defraud, hinder, or delay his creditors."    This is the only exception within the statute, and the doctrine of *expressio unius, exclusio alterius,* applies with peculiar force in construing this provision of

this act. Congress has clearly defined its object, and the wisdom of the law must be remitted to that branch of our government, and it is the duty of the courts to construe the law as found upon the statute books, where it is clear and free from doubt and ambiguity.

In *Plymouth Cordage Co. v. Smith*, 194 U. S. 311, Chief Justice Fuller, speaking for the court, in determining the question whether or not the circuit court of appeals had jurisdiction in bankruptcy matters to superintend or review questions of law in the district court of Oklahoma, uses the following language:

"We think the law should be taken as it is written and perceive no adequate reason for concluding that the real intention of congress is not expressed in the language used."

We think that this language is applicable to the question here under consideration.

In *Duncan v. Landis,* 106 Fed. Rep. 839, 5 American Bankruptcy Rep. 649, 673, Judge Gray, speaking for the United States circuit court of appeals of the third circuit, with reference to the interpretation to be placed upon this definition, in the course of the opinion, says:

"This is a statutory definition of insolvency, and differs somewhat from the ordinary and popular definition, and must be strictly adhered to."

It was also held in the case of *In re Baumann,* 96 Fed. Rep. 946, that property exempt from execution under state laws is included in assets on the trial of a contested petition in involuntary insolvency upon the question of the respondent's solvency or insolvency.

Brandenburg, in his excellent work on Bankruptcy, (2 ed.) sec. 3, page 53, says:

"As the law expressly defines solvency, all that is necessary in any particular case is to determine whether the aggregate of the alleged insolvent's property, exclusive of any he may have conveyed, transferred, concealed or removed, or permitted to be concealed or removed, with intent to defraud, hinder or delay his creditors, is, at a fair valuation, sufficient in amount to pay his debts; if not, he is insolvent. Hence, on the trial of a contested involuntary petition, in determining the issue of the solvency or insolvency of respondent, all the property which he owns is to be reckoned in computing the amount of his assets, including property exempt from execution by the laws of the state, but excluding such as he may have transferred or concealed in fraud of his creditors, or conveyed without consideration immediately preceding his bankruptcy and money upon his person."

Collier, on his work on Bankruptcy, (5 ed.) page 4, in discussing this subject, says:

"The definition of insolvency contained in this section has been much criticised. It is undoubtedly humane, but is thought to put creditors at their debtor's mercy. On the other hand, it protects the debtor whose property is not quickly convertible. In this aspect, it results in conditions not unlike those of a debtor who has taken advantage of the suspended payment periods sanctioned by some of the continental bankruptcy systems. In actual practice, it has done little harm. The Ray amendatory bill of 1902, sought to insert words which would have excluded exempt property from the aggregate of a debtor's assets in determining whether he was insolvent, but the senate, unfortunately, struck out the provision. Exempt property should, therefore, be included as well as that not exempt."

It follows that there was no error committed by the trial court in holding that exempt property, both real and personal, should be included in determining the solvency or insolvency of the respondent.

It is contended by plaintiff in error that the court erred in the admission of evidence with reference to the fair valuation of the notes and accounts. It appears from the record that the respondent was engaged in the general agricultural implement business from 1898 until his business was closed by virtue of the bankruptcy proceednigs, on October 31, 1901. That he transacted a large amount of business on credit; in fact, that the greater portion of the business was done on credit. That it was his custom to take notes for the purchase price of machinery and implements sold by him. That on October 31, 1901, the date of the filing of the petition in bankruptcy, he probably had on hand over two hundred notes, executed by various parties, for various sums, and that the aggregate amount of the outstanding accounts and notes was approximately eight thousand dollars.

The fair valuation of these notes and accounts, within the meaning of the bankruptcy laws, became very material in determining the solvency of the respondent, and a large volume of evidence was introduced on this branch of the case. The respondent offered as one of the witness on this issue the witness, J. A. Burns, who testified that his business was that of selling farm implements and machinery, and that he had been engaged in such business for eighteen years. That he had had considerable experience in buying, selling, and handling promissory notes of farmers, taken for implements, as

a retail dealer. And on page 349 of the record the following question was put to the witness:

"What other experience, if any, have you had in this county in the way of handling and collecting and taking notes of this kind?"

To which he answered:

"Nothing, except that for a few months I was collector for the McCormick Harvester and Machine Co. But I took no notes; I was simply collector." And then, on page 350, the following question was put to him:

"You may state, Mr. Burns, from your experience in handling the accounts and kind of notes usually taken in the implement business, such as Mr. Smith carried on, what percentage of the notes and accounts of the farmers of this county would be collectible by a man in that business."

This question was objected to by the petitioners, on the ground that it was incompetent, irrelevant, and immaterial calling for a conclusion of the witness, and not the best evidence. The objection was overruled, to which ruling of the court the petitioners at the time excepted, and the witness then answered:

"At least 95 per cent of the notes could be collected."

The next witness offered on this question by the respondent, was S. F. Robinson, who testified that he also had had experience in handling and collecting farmers' notes for farm implements in Kingfisher county for several years. That he was engaged in the business of collecting for the McCormick Harvesting Machine Company, and then, on page 354 of the record, the following question was put to this witness: "In your opinion, what percentage of the notes could be col-

lected or would usually be collected in Kingfisher county, or counties like this, for agricultural implements, taken in the usual course of business?" To which counsel for the plaintiff objected, on the ground that it was incompetent, irrelevant and immaterial, calling for a conclusion of the witness and further that it was secondary evidence. The objection was overruled, to which ruling the petitioners excepted. The witness answered:

"I think at least 95 per cent from the fact that there was in '98 over 100 binders sold and I collected, I think, at least 95 per cent of them."

Similar questions were asked other witnesses on behalf of the respondent, to which the petitioners objected on the same grounds, which objections were overruled, and exceptions noted.

There was no error in these rulings of the court. This testimony was material and competent for the purpose of tending to establish the fair market value of the notes at the time of the alleged insolvency, and any testimony which would tend to prove the fair market value of the notes at the time was material to the issues ivolved. But it is contended that the court erred in charging the jury as to what constituted the true rule with reference to the valuation of the notes and accounts. Upon this branch of the case the court instructed the jury as follows:

"In determining the value of the property and assets of the respondent on the 31st day of October, 1901, you are required to fix such value at a fair valuation. This does not mean what the property would bring at a forced or auction sale. A fair valuation of the real estate is such sum as

the property would reasonably have sold for to a purchaser desiring to buy, and the owner wishing to sell. A fair valuation of the merchandise, implements, and other personal property, is the sum that could have been fairly realized from the sale of such property in bulk, or in parcels, in the usual and ordinary way of selling such classes of property for cash in this market. A fair valuation of the notes and accounts is the net sum that in your judgment, from all the evidence before you, could have been, with reasonable diligence, realized from the collection of such notes and accounts, within a reasonable time after Oct. 31, 1901, and not the amounts as shown by their face, unless their face value was in fact their fair value."

We think this instruction is a correct statement of the law, and is in harmony with the decision of Judge Gray in the case of *Duncan v. Landis,* 106 Fed. 858, in which case the following instruction was given to the jury by the trial court:

"The question then for you to determine was whether the aggregate of her property was or was not sufficient, at a fair valuation, to pay the amount of her debts. Now, gentlemen, what a fair valuation is, under the provisions of this act, seems to me to be this: The law contemplates that, where a man has property of his own which is sufficient for him to realize from and meet his obligations, he is solvent, and it is only when that cannot be done that the law will proceed to liquidate that property, turn it into cash, and pay off his indebtedness * * * Now, we think that the fair criterion of the value of that stock was what it would have brought from a purchaser who desired a stock of that kind at that time. Now, if that stock would have brought sufficient to pay all the indebtedness * * * to meet all these obligations * * * then it is quite evident that Mrs. Duncan was not insolvent. *But if, under her situation, and the number and amounts of obligations owing by her, the*

*time when they were due, which, of course, are elements re-*
*garded by the purchaser of property* .* * * *If, under*
*all these circumstances* (even if a purchaser had been found
who wanted the stock for the price, and who acted in fair-
ness and with due regard and consideration for the value of
the property), the stock would have appeared sufficient to
pay off this indebtedness, then she was insolvent, under the
act, and your verdict should be to that effect."

In the course of the opinion, Judge Gray, in reviewing
this instruction, which he held to be erroneous, said:

"We think the learned judge of the court below, in thus
charging, gave to the jury an erroneous impression as to
how a 'fair valuation' of the property of the debtor was to be
arrived at.   We think that the present market value of the
property in question would be a fair valuation of the same.
There is nothing in this section of the act that authorizes that
the market value be ascertained by what a purchaser would
give who desires to take advantage of the necessities and em-
barrassments of the owner, in order to procure the same at a
price less than its real or market value.   We think the words
above quoted from the charge of the court below which we
have italicized have no place in an explanation of what is the
criterion of a fair valuation. *Lawrence v. City of Boston,*
119 Mass. 126; *Dwight v. Commissioners,* 11 Cush, 201;
*Railroad Co. v. Doughty,* 22 N. J. Law, 495; *Murray v. Stan-*
*ton,* 99 Mass. 348.   Again, the act expressly says that a man
shall be deemed insolvent only when the aggregate of his
property, at a fair valuation, shall not be sufficient to pay
his debts; but the court below gives an unwarranted construc-
tion to this definition, by adding to the plain meaning of a
'fair valuation' the requirement that the debtor must be able
to realize from his property a sufficient amount to pay his
debts.   This seems to us to clearly depart from the plain
requirements of the statute, by adding a condition not therein

set forth.   A man's property, at a fair valuation, may amount to sufficient to pay his debts, although he might not be able to realize at once the amount of that valuation.   In these two respects, we think the charge of the court, under this provisions of the statute, misleading, and calculated to place the debtor in a harder situation than was intended by the statute."

Manifestly it would be a harsh and narrow rule to hold that where involuntary proceedings in bankruptcy are instituted against a debtor, that the criterion in determining the fair valuation of his property would be what could be realized therefrom at the very moment such bankruptcy proceedings were instituted, and, in our opinion, such is not the intent of the bankruptcy act.

And *In re Hines,* 16 Am. B. R. 295, the United States district court of Oregon, in a decision handed down in February, 1906, speaking by Judge Wolverton, says:

"As it respects property considered in a commercial sense, I can conceive of no better or surer standard by which to arrive at a fair valuation than the market value; that is, what the property will probably bring, or is worth in the general market, where everybody buys.   It could not be what it is worth to one•person or to another specially circumstanced, or having special use for a particular article, but what it is worth as a marketable commodity, at a given time, with no special conditions prevailing other than affect the market generally in the locality where the commodity is for sale.   'We think,' says Mr. Justice Gray, in an able and elaborate opinion rendered in the circuit court of appeals for the third circuit, in the case of *Duncan v. Landis.* 5 Am. B. R. 649, 106 Fed. 839, 858, 'that the present market value of the property in question would be a fair valuation of the

same.' See also *In re Bloch,* 6 Am. B. R. 300, 109 Fed. 790, and *In re Coddington* (D. C.) 9 Am. B. R. 243, 118 Fed. 281.

"The intendment of the statute could scarcely be otherwise, giving the language employed its usual and natural significance. The difficulty is, and perhaps always will be, in arriving at the market value. Unless the commodity has a value quotable in the current markets of daily or frequent sales, there is much of opinion that enters into the estimate, and from this must be deducted the probable market value, and consequently, under the bankruptcy act, a fair valuation."

The instructions of the court, when taken as a whole, we think not only correctly stated the law, but were as favorable to the petitioners as the facts would justify. And there was no error in refusing the instructions offered by the petitioners since the general charge of the court covered the entire law of the case. Neither was there any error committed in the admission of evidence with reference to the Sattley transaction.

Upon a careful examination of the entire record, and the errors assigned by appellant, and the argument in support thereof, we have reached the conclusion that there was no error committed by the trial court which would justify a reversal of the cause; and believing that the evidence fully sustains the findings of the jury, and that the petitioners have had a fair and impartial trial, the judgment of the court below is affirmed.

Burford, C. J., who presided in the court below, not sitting; Burwell, J., dissenting; all the other Justices concurring.