In re KOBRE et al.

(District Court, E. D. New York. May 10, 1915.)

1. BANKRUPTCY ⬢�net54—INSOLVENCY—"FAIR VALUATION" OF PROPERTY—REAL ESTATE.

The "fair valuation" of real estate for the purpose of determining insolvency under Bankr. Act 1898, c. 541, § 1a(15), 30 Stat. 544 (Comp. St. 1913, § 9585), where no definite market value can be·established and expert testimony must be relied on, is the amount which the property ought to give to a going concern as a fair return, if sold to some one who is willing to purchase under ordinary selling conditions, and not what it might probably bring at a forced sale or an auction sale.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 54, 84, 85; Dec. Dig. ⬢⟝net54.

For other definitions, see Words and Phrases, First and Second Series, Fair Value.]

2. BANKRUPTCY ⬢⟝net54—INSOLVENCY—FAIR VALUATION OF PROPERTY—MORTGAGE SECURITIES.

The fair valuation of mortgage securities held by a bank, in determining the question of insolvency in bankruptcy proceedings, is to be based on what could be realized therefrom by the bank as a going concern in the usual course of business, and not the so-called market value which could be obtained by treating them as quick assets.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 54, 84, 85; Dec. Dig. ⬢⟝net54.]

3. BANKRUPTCY ⬢⟝net62—PARTNERSHIP—ACTS OF BANKRUPTCY.

Where a partnership as such is found insolvent at the time of the commission of acts which are specified in the statute as acts of bankruptcy, such acts constitute acts of bankruptcy as to the partnership, but would not be such as to a solvent partner whose estate is sufficient to meet the partnership deficit.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 57; Dec. Dig. ⬢⟝net62.]

4. BANKRUPTCY ⬢⟝net54—PARTNERSHIP—INSOLVENCY.

No partnership can be compulsorily adjudicated a bankrupt in which any partner appears to be solvent to the extent of having a surplus of property over his personal debts and those for which he is liable as a member of the firm.

[Ed. Note—For other cases, see Bankruptcy, Cent. Dig. §§ 54, 84, 85; Dec. Dig. ⬢⟝net54.]

5. BANKRUPTCY ⊕⟲54—PARTNERSHIP—SOLVENT AND INSOLVENT PARTNERS—
CONSENT TO ADJUDICATION.
Where a partnership as such is insolvent, as are two of the three
partners, while the assets of the solvent partner, although sufficient in
amount at a fair valuation are admittedly or probably, as administered
in bankruptcy, insufficient with the partnership assets to pay all the
partnership debts in full, under Bankr. Act 1898, § 5h (Comp. St. 1913, §
9589), and with the consent of the solvent partner, the firm and the
other two partners may be adjudicated bankrupt and the firm and indi-
vidual assets all administered by the bankruptcy court; the solvent part-
ner being permitted to share in such administration by his appointment
as a trustee.
[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 54, 84, 85;
Dec. Dig. ⊕⟲54.]

In the matter of Max Kobre, Sarah Kobre, and Moses Ginsberg,
copartners doing business as Max Kobre's Bank, alleged bankrupts.
Adjudication against the partnership and Max Kobre and Sarah Kobre
individually.

See, also, 224 Fed. 104, —— C. C. A. ——.

Carmody, Blauvelt & Kellogg, of New York City (A. G. Thorne,
of counsel), for Max Kobre and Sarah Kobre.

Samuel A. Telsey, of Brooklyn, N. Y. (I. R. Oeland, of New York
City, of counsel), for Ginsberg.

Simon & Weinstein, of Brooklyn, N. Y. (Abraham H. Simon, of
Brooklyn, N. Y., of counsel), for petitioning creditors.

Solomon S. Schwartz, of Brooklyn, N. Y., for intervening creditors.

Joseph Goldstein, of Brooklyn, N. Y., for intervening creditors.

Morrison & Schiff, of New York City (I. D. Morrison, of New York
City, of counsel), for intervening creditors.

Albert A. Levin and Jacob A. Freedman, both of Brooklyn, N. Y.,
for intervening creditors.

Leon Sanders, of New York City (L. E. Schlechter, of New York
City, of counsel), for Canal Street creditors.

Jeremiah T. Mahoney, of New York City, for the receiver and for
the Superintendent of Banks.

CHATFIELD, District Judge. The changing situations presented
with almost every hearing in this case require frequent recurrence to
the fundamental relations of the parties and the bearing of those re-
lations upon the evidence with respect to the questions under consider-
ation at the moment.

The original petition, filed in the Southern district of New York, the
residence of Max Kobre and Sarah Kobre, alleged them to be copart-
ners and insolvent. The first petition in this district alleged the same
parties to be copartners and insolvent. The next petition in this dis-
trict alleged one Moses Ginsberg to be a partner with Max Kobre, and
Sarah Kobre was not included as a partner. This petition was limited
to the institution known as the Brownsville Branch of Max Kobre's
Bank. Yet another petition was filed alleging that Max Kobre, Sarah
Kobre, and Moses Ginsberg were insolvent and were copartners in the
Brownsville Branch, the Williamsburg Branch, and even in the busi-

ness in New York, which was affected by the petition filed in the Southern district.

It immediately appeared upon the taking of testimony that the business had been started in the Southern district of New York, at the Canal Street Bank, by Max Kobre, and that later his wife had been joined as a partner but with an apparently limited share in the proceeds of the business. It then appeared that Ginsberg, who had been suspected of, and charged with, acts indicating a proprietary interest in or concealment of the property of the Brownsville Branch, and in certain funds of the New York Bank, which had been transferred to Brooklyn for investment, had acted like a partner as well as manager, and in ways justifiable only upon an apparent showing of insolvency. These transactions would not bear scrutiny if the bank was plainly insolvent and if Ginsberg were acting for his own interest or that of Kobre rather than for the depositors.

It appeared that the Brownsville Branch had been started with no capital whatever; that all the work had been done by Ginsberg, except for purely casual and nominal conference with Kobre, and with acquiescence by Ginsberg in such matters as Kobre insisted upon, i. e., the retention of one Frankel as a clerk, the making of a loan to one Oppenheim, and occasionally a real estate investment which Ginsberg was indifferent to, but in which Kobre took particular interest. Ginsberg soon began to share the losses and each year to insist upon a greater share of the profits.

It appeared that the profits of this institution were figured out by determining at the end of the year the amount which might, as it were, be used for the purpose of dividends. From this, $2,000 was paid to Mrs. Kobre (it does not appear whether she received anything at all from Canal Street), and then Max Kobre and Moses Ginsberg divided the balance, giving Ginsberg the least amount which he would take. Usually considerable adjustment was necessary to reach a satisfactory basis to stand as the arrangement for the succeeding year.

By 1913, Ginsberg was demanding an equal share in this balance, and by 1914 he finally was recognized as having equal rights with Kobre. In the meantime, he had changed from a straight salary to a drawing account, and the intervention of the new banking law of the state of New York caused an entire change in the situation.

None of the banks had its surplus or assets properly safeguarded for the benefit of the depositors. Kobre considered himself the owner, and Ginsberg considered that his control over much of Kobre's property furnished security to Brownsville. The bank account used for extraordinary needs was in Kobre's name, and he made withdrawals therefrom which have not been explained and which depleted the Brownsville institution. Ginsberg had a power of attorney over this account and used it when he needed funds for investments.

Upon these facts, the question of partnership having been determined by a holding that Moses Ginsberg was a partner in the Brownsville Bank, and also that the Brownsville Bank had been conducted by Kobre and Ginsberg as an entirely separate institution from the bank in New York, and there being no apparent difficulty in separating the

two institutions, the issue of solvency in Brownsville became of more importance.

An appeal to the Circuit Court of Appeals from the holding that Ginsberg was a partner in the Brownsville institution, and a petition to review the order of the court directing him to defend the action as a partner, was heard in conjunction with an appeal from another order of this court consolidating the petition filed in this district against the Williamsburg Branch, but denying that petition for consolidation so far as Brownsville was concerned, and also from an order determining that Ginsberg was not a partner in the New York bank. 224 Fed. 104, —— C. C. A. ——.

In the testimony leading up to these determinations, it has appeared that Ginsberg had entered upon the books of the Brownsville Bank valuations for the real estate (held by the bank as an institution) largely in excess of the figures previously shown upon those books as the cost price thereof. Ginsberg had also had prepared partnership agreements with Mr. Kobre, under which he and Kobre were to become partners in all the institutions on equal terms. It appeared that Mrs. Kobre was to retire from the business and to receive certain real estate in lieu of any claim of dower in the properties in which her husband might be interested as a partner.

In the meantime Ginsberg had gone over to the Canal Street institution in the latter part of May and in the month of June, 1914, and in anticipation of July 1, 1914, when the new banking law went into effect, had been arranging matters with the evident idea that if he shared the responsibilities of a partner, in case the new agreement went through, he should have control of the assets, and that those assets should be so shown upon the books as to prove the solvency of the three institutions, and so that he (Ginsberg) should receive proper compensation for the work which he expected to undertake in managing the institutions. He also invested large amounts in real estate for the New York bank.

He had previously reached the point of an equal share in Brownsville, which was apparently making money. He was insisting upon an equal share in the entire institution, while Kobre was seeking to satisfy Ginsberg and to obtain the benefits of the Brownsville assets, in order to make a showing of solvency in the Canal Street Bank, but yet to also persuade Ginsberg to give up his one-half share in Brownsville, and to be satisfied with a one-third share in the whole for the increased work and trouble of what might not furnish an increased amount of profit.

Pending the hearing of the petitions to review, and assuming that a further hearing of the issue and a final adjudication in bankruptcy or dismissal of the petition against one or all of the alleged bankrupts might present an entirely different record than that which the intervening creditor sought to have reviewed at that time, the petitioning creditors, who were claiming Ginsberg to be a partner, insisted upon proceeding with the hearings to determine the insolvency of the Brownsville Bank and consequent commission of acts of bankruptcy therein.

It then became apparent that Max Kobre, who had offered a composition in the Southern district of New York, in which he purposed using the Brownsville assets, was unable to show any condition approaching solvency in the Canal Street institution by itself. The disappearance of the assets of that institution and of those withdrawn from Brownsville by Kobre have not been explained, and we have nothing to do with that question in this case.

Mrs. Kobre appeared to have no assets except the house in which she lived, so far as this record was concerned, and the answer of Mr. Kobre having been withdrawn for the purpose of presenting the offer of composition, the offer of composition having failed, and the answer of Kobre having been reinstated only to the extent of allowing him to participate in the hearing of the issues in connection with the answer interposed by Ginsberg, it was admitted upon the record that the individual properties of Mr. and Mrs. Kobre in the Canal Street Bank would fall far short of paying its debts, and that their liabilities could not be met from their share of the assets of Brownsville, even in case Brownsville should be shown to be solvent, with a surplus large enough to partially overcome the deficit of Canal Street.

It also appeared that the completion of the arrangement by which Ginsberg was to become a partner in the entire institution had been prevented, even if it might otherwise have occurred, by the effect of a run upon other banks on the East Side of Manhattan, which resulted in the visit of the Superintendent of Banks of the state of New York to all of the Kobre institutions and his taking charge thereof upon August 3, 1914. Since that time the Superintendent of Banks, as receiver appointed by this court, has had charge of the assets of the Brownsville Bank and of the Canal Street Bank, so far as they were in possession of the Brownsville Bank in this district.

The further taking of testimony upon the issue of insolvency proceeded before the argument of the appeals above referred to, and before the determination thereof. It appeared from the testimony that Moses Ginsberg not only controlled and managed the affairs of the Brownsville Bank, but that he, with the acquiescence of Mr. Kobre, held himself out to the public as having a personal interest therein. The transactions ratified by both were conducted by Mr. Ginsberg as principal, but always apparently with an accounting to the bank and for the benefit thereof. The management of certain properties and investments from New York were conducted by Ginsberg individually, and corporations were formed for the development and sale of property in which Kobre and Ginsberg were equally interested, but which again were entered upon the books of the Brownsville Bank, were there treated as matters which that bank must account for, and in which the individual responsibilities of Kobre and Ginsberg were actually involved, even though the name of "Moses Ginsberg, manager of the Brownsville Branch" (like that of a managing partner), kept from public gaze the real relations of the parties.

It has appeared from the testimony that a certificate was filed by Max Kobre and his wife, that they were doing business as copartners in the Brownsville Branch, and that this certificate was filed long after

the branch was opened and after Moses Ginsberg was sharing in the profits and losses.

It happens that no losses, in the ordinary sense, have occurred, and that in but one year had it been necessary to deduct any items for failure to show a net profit over expense in the preceding year. But such deductions as were made, even for expenses in running the bank, were shared proportionately by both men and would have been shared by Mrs. Kobre if her interest had not been fixed in amount. No certificate was ever filed in behalf of Moses Ginsberg, doing business under any name, and the question of partnership seems not to have been discussed between the two men until Moses Ginsberg was needed by Kobre in New York.

The testimony taken on the hearing with respect to solvency has further shown many additional instances where Brownsville and Canal Street have accorded favors to one another, but where their actual business transactions have been as strictly conducted and expenses or charges as accurately entered up as if they had been institutions conducted under a separate bank charter. Moses Ginsberg looked after the assets in which he was having a share as jealously, so far as allowing Canal Street to have any claim thereon, as he would if a certificate had been on file in the county clerk's office showing his equal ownership therein.

It further appeared that certain items in the books of the Canal Street Branch, for which corresponding real estate properties and securities were not physically evidenced in the Canal Street Branch, and certain moneys expended by Kobre (to replace which he was anticipating profits from the increase of value in the real estate held for him by Brownsville) were actually entered in the Canal Street books after the first visit of the Superintendent of Banks and by a telephone conversation (traced to Kobre alone) corresponding charges against Brownsville, or credits to Canal Street, were entered upon the books of the Brownsville Branch, either just before or just after the visit of the superintendent.

These charges have been disavowed by Mr. Ginsberg, who testified that he had no knowledge thereof, although one of the bookkeepers testified that Ginsberg instructed him to make some of the charges. This testimony, however, was not persuasive and showed even more distinctly the separate nature of the institutions and the difference of Ginsberg's interest in Brownsville from his prospective connection with New York.

It has ultimately become apparent that, so far as the business of Brownsville was concerned, Ginsberg treated its assets, excepting those in the possession of Kobre, as if they were his own, but always with an eye to their use for the Brownsville Bank. His control thereof was in every respect that of a partner or owner, and the effect of the advertisements, which continued up to August, 1914, and the nominal conduct of the business by Ginsberg as manager, apparently were exploited so as to call attention to the well-known name of "Kobre" and to the local reputation of Ginsberg, as the two elements going to make up the solidity of the business which Ginsberg managed.

Much testimony was devoted to following up certain properties or

classes of assets, and some of these must be referred to later. Various appraisals were presented, using as a standard the list of properties and the general alignment of assets made by the Banking Department upon the closing of the bank on August 3, 1914.

It appeared in the course of the hearing that Mrs. Kobre had never been served with a subpœna in this proceeding because of the reported surrender by her of all claim to any partnership assets and her supposed lack of property as an individual. But when it became apparent that Mrs. Kobre was, so far as the creditors were concerned, at least a nominal partner, and that she was a necessary party to the bankruptcy proceedings, she was brought in upon a proper petition, interposed an answer raising the issues of insolvency, etc., and facilitated the conduct of the case to a legal conclusion.

The taking of testimony terminated upon the 23d of February, 1915, since which time the writing out of the minutes and submission of briefs has been going on.

Upon the 19th day of April, 1915, exhibits were presented and added to the record, by order of the court, showing that upon the 24th day of December, 1912, Max Kobre and Sarah Kobre entered into a formal partnership agreement with relation to Canal Street, Brownsville, and Williamsburg, by which Mrs. Kobre was to become a limited partner and to release all claims of dower in the properties of the partnership. This also provided for her rights in case of Kobre's death, and this seems to have been one of the purposes of the agreement. It was pursuant to the terms of this agreement that the certificate was filed by Max Kobre and his wife in the county clerk's office of Kings county, showing their partnership also and their doing of business in the name of "Max Kobre's Bank, Brownsville Branch." But, at the time when Ginsberg was negotiating with Kobre to become a general partner in the three institutions, Mrs. Kobre agreed to release her interest in the partnership properties and to withdraw from her limited partnership therein, to release her claim of dower in any property held by the institutions known as "Max Kobre's Bank," and also to take in return therefor the house in which she lived.

It appears that upon the 3d of July, 1914, Mrs. Kobre executed the papers by which she released her interest in the partnership and her claim to any of the business properties, and in one of these papers she declared Max Kobre to be the sole owner of the banking business known as "Max Kobre's Bank." This agreement was drawn by the attorney for Mr. Ginsberg and was subsequent to the time when Ginsberg is claimed by the New York creditors to have become a partner in all three institutions, but long before any suggestion that he was in fact responsible to the creditors of Brownsville as a partner in that branch.

On the 30th of July, 1914, Max Kobre deeded to his wife, by an instrument recorded in section 7, Liber 172, p. 180, register's office of New York county, upon the 10th of August, 1914, the house in which they were living, and thus apparently concluded, so far as he and she were concerned, the transaction by which she ceased to share in the profits or losses of the partnership, if the institutions were solvent. It is evident that as against creditors these papers make no difference,

and that the proceedings in this district, including Mrs. Kobre as a partner but leaving open for consideration in the bankruptcy proceedings in the Southern district the determination of the validity of the conveyance to her, show the correct idea of the rights of the parties from the standpoint of their creditors.

At the close of the entire case, motion was made on behalf of the alleged bankrupts to dismiss the proceeding, because of the claimed solvency of the Brownsville Bank or the partnership of Kobre and Ginsberg therein, and because of the alleged failure of the creditors to show any independent act of bankruptcy which would give the bankruptcy court jurisdiction. Subsequently Ginsberg withdrew the motion to dismiss if he should be held to be the solvent partner in an insolvent bank.

The creditors have presented numerous acts which would be sufficient to constitute an act of bankruptcy if insolvency be predicated. They have shown what would be preferences, and what would be apparent concealment of assets with intent to hinder the creditors, if insolvency be admitted or shown. But treating Brownsville as a separate institution, and with an admission or finding of solvency, no one of these acts would be a sufficient cause for jurisdiction in bankruptcy, and the issue therefore narrows down to the question of insolvency alone.

But, as a result of the evidence upon this issue of insolvency, a number of complications are presented. No party to this proceeding has attempted to claim solvency for the Canal Street Bank as independent of Brownsville, nor for Max Kobre and Sarah Kobre as partners in Brownsville, even if their interest in the properties of the Brownsville Bank be used for the payment of their debts from the Canal Street Branch, over and above the assets thereof.

It is therefore beyond dispute that Max Kobre and Sarah Kobre, so far as their creditors are concerned, must be adjudged insolvent as individuals in the proceeding in this district. If Sarah Kobre can show a withdrawal from the business and an entire accounting for any assets for which she is responsible to the business, prior to the 3d of August, the ultimate effect would be to relieve her from the proceedings, but not to change the result.

The Brownsville institution was either solvent or insolvent upon August 3, 1914, the date as of which all computations are made. Moses Ginsberg is admitted to be solvent so far as his debts outside of those of the Brownsville Bank are concerned, and he has assets admitted by himself, and not disputed by the creditors, amounting in value to $40,000.

There is a suggestion in the testimony that other assets are available to Ginsberg; but, even though the creditors might realize upon those assets, they cannot be used by Ginsberg to show solvency, when he disputes the existence of such assets, and we therefore have the sum of $40,000 as the total of his contribution in passing upon the question of solvency.

The finding of acts of bankruptcy, therefore, cannot be made against Ginsberg as an individual or apart from his transactions as partner.

As a partner, even though able to pay his own individual debts, the commission of acts of bankruptcy depends upon the solvency of the partnership. What would be the result of such acts, as well as the effect of Ginsberg's solvency as an individual, and the showing which would be made by applying his assets to the payment of partnership debts, will be considered later.

A determination of the condition of the partnership and a valuation of its assets and liabilities are necessary as premises for further consideration. [Here followed itemized statements of assets and liabilities at the valuations claimed by the different parties in interest, which are summarized below.]

The foregoing table follows the classification of assets and liabilities used by the Superintendent of Banks in making his inventory which was intended to show the condition of the bank at the close of business on August 3, 1914.

There has been included in the first column of this statement the amount of all items as to which no question is raised, and such parts of certain other items as are admitted by the various parties hereto to be correct according to the books of the bank or the testimony in the case. This column contains also items from the superintendent's statement for the values of the real estate, and of the mortgages held by the bank. As to these items, the parcels and the mortgages included have been agreed upon, and it is admitted that the figures shown by the Superintendent of Banks is a correct arithmetical total of the parcels included by him, at the amounts shown by his appraisal. But each party has included in his own valuation either additions or deductions, as the case may be.

The second column shows items entirely omitted in the compilation by the Superintendent of Banks, but which the various creditors and the alleged bankrupts agree should have been included.

The third column of assets sets forth the additional amounts which the alleged bankrupts, Kobre and Ginsberg, seek to have added to the assets.

The fourth column shows the claims of the petitioning creditors with respect to the same items, and also the deductions from the real estate and mortgage valuations claimed by the petitioning creditors.

The fifth column shows the claim of one of the intervening creditors, who agrees with the Superintendent of Banks as to the valuation of the real estate, but makes a different reduction in the valuation of the commercial paper and of the bonds and mortgages. He also adds two items shown by the testimony to have been paid to or used for the benefit of the Brownsville Bank from the cash account of the Canal Realty Company which was transferred to Brownsville on June 22, 1914.

The total of the assets in column 1 is..........................$1,398,207.99
The items to be added from column 2, and as to which there
  seems to be no dispute, amount to............................   21,022.17
This total includes the amount charged against Kobre from the
  Oppenheim transaction and the amount paid on Nos. 38 and 75
  of the New York properties, but leaves out for the time being
  the ...........................................................   19,000.00
  mortgage of the Canal Realty Company, and the...............   17,360.80
commissions claimed by Ginsberg.

Of the items claimed in column 3, it is impossible to include the $181.91 which Ginsberg seeks to add to the amount of foreign currency. This item arises from an improvement in the rate of exchange, but the value of the funds at the rate of exchange upon August 3d must be used as the basis for finding insolvency as of that date.

The next item of $4,000, upon stocks and bonds, represents the difference between the purchase price of those stocks and their value upon the floor of the Exchange on the 3d of August. As a matter of fact, they are worth much more at the present time than their cost value, but again their market value was indicated by the Exchange prices as of August 3, 1914.

The item of $570.96 is claimed by Ginsberg to be possible of collection, but the evidence does not seem to justify using it as a probable asset.

The item of $15,132, used to pay life insurance policies which according to the testimony so far produced are assets of Kobre as an individual, and available only to the creditors of the New York Bank, is a proper charge against the individual funds of Kobre in the hands of the Brownsville Bank, and therefore should be set off and treated as an asset.

In the same way, the item of $932.07 is collectible and appears now to be a proper asset.

The item of $637.40 belongs in the Canal Realty Company's account, and will be considered later.

The item of $3,338.47, added to the commercial paper (or bills discounted) by Ginsberg and by the creditors, should be included in the total of assets.

It appears that the Superintendent of Banks deducted certain items amounting to $10,659.46 as in his opinion uncollectible. Of this, $3,-743.19 was one of the items of the Oppenheim account which appears to have been guaranteed by Mr. Kobre. This item has been included in column 2, and the balance of $3,338.47 which the creditors show in the testimony should first be added, and then, whatever amount may be fixed for general uncollectibility, subtracted from the total.

The items of $48,500 and $7,000, representing the values of Nos. 44 and 45, should be added. These two parcels of real estate seem to have belonged to Brownsville at all times, but they were acquired in connection with transactions which involved the use of moneys belonging to the New York Bank, and, in the absence of testimony tracing to the Brownsville Bank the repayment of the funds so used, it is apparent that the Superintendent of Banks was justified in leaving them out of his inventory.

On the present condition of the case, these items have been properly traced to Brownsville and seem to be its property.

The other items of real estate go into the transaction with reference to the Canal Realty Company and will be disposed of later.

The item of $1,103.72, foreign department surplus, is claimed by Ginsberg to be explainable; but the cash representing this item has not appeared, and it would seem to be a question of bookkeeping, which does not add to the visible assets.

We have therefore, as above stated, to add from column 3, $75,-539.94. The total of assets exclusive of the items reserved therefore equals $1,494,770.10.

Returning then to the items that have been passed, we will take up, in order: (1) The value of the real estate; (2) the value of the bonds and mortgages; (3) the property of the Canal Realty Company; (4) the question of commissions; and (5) the deductions upon the commercial paper. But, before so doing, it is possible to fix the amount of liabilities exclusive of the items going into the Canal Realty situation.

In the table of liabilities, column 1, again, shows the amounts either found upon the books or ascertained by the Superintendent of Banks and admitted by the creditors to be correct. This makes a total of $1,494,308.94.

In column 2, the item of $26,800 mortgage against the property No. 44 and 45 should be included, as also the sum of $328.33 accrued interest, and $4,038.04 taxes, etc., of which the Superintendent of Banks did not have information at the time of making up his inventory.

An item of $630 claimed by Mr. Frankel, against the bank because of some alleged promise to give him a bonus or net payment on account of salary, based upon the earnings of the bank, is disputed by Ginsberg; but certainly was a claimed obligation which would have to be met, if valid, and therefore must have been entered as a liability on August 3, 1914, in considering the question of solvency.

The item of $1,046.66 is claimed by Ginsberg to have been more than met by taxes and other payments which can be figured out as chargeable against Canal Street, but according to the showing of the books, and upon the testimony as it now stands, this general denial does not meet the specific compilation of the Superintendent of Banks, and it would seem that this item must stand as a liability.

We have therefore to be added from column 2 a total of $32,843.-03. This makes the aggregate liability outside of the Canal Realty Company matters, which will be disposed of as a net balance one way or the other, $1,527,151.97. Upon its original inventory, the Banking Department showed an excess of liabilities over assets of $96,877.61; but the inclusion of the additional items makes this apparent deficit useful only in so far as it shows the apparent condition to the Bank Examiner on his first cursory examination.

The testimony contains a number of appraisals of the real estate and of the bonds and mortgages owned by the bank, and valuation of the negotiable paper yet uncollected.

The first question arises as to the value of the real estate. As has been said, Mr. Ginsberg, with Mr. Kobre's knowledge, changed upon the books of the bank the inventory values at which this real estate was carried, and placed thereupon book values corresponding to what he thought the bank could realize therefor. These figures total $1,-070,633.66. But, upon the trial, Ginsberg and his experts have presented as their opinion of an actual market value for this property, $942,650. Of this, $128,500 is an increase over the amount of the inventory by the Superintendent of Banks, and $222,500 is the value of

property not included in the bank's inventory, but upon which mortgages are outstanding and includes the land owned by the Canal Realty Company.

It will be seen that the property not included, if allowable at these figures, would wipe out any deficit shown by the Bank Department's figures.

The appraisers produced by the creditors generally value this real estate at figures below those of the Banking Department.

[1] The statute says that "insolvency" exists when the property is not at a fair valuation sufficient in amount to pay the debts. Section 1, subd. 15. Market value is frequently used (where a definite market value can be fixed for the product) as a standard of fair valuation. With respect to real estate, market value must be assumed to depend on whether a market exists or can be created by an attempt to sell the property, and expert opinion of market value must necessarily be intended to fix the value which the property ought to give as a fair return, if sold to some one who is willing to purchase under the ordinary selling conditions. If property is not worth this amount to a going concern, then no fair valuation could be entered upon the firm's books, for a valuation based only upon what could be obtained at a forced sale or an auction sale, or which might be realized under some accidental or unusual situation, would never be taken as the "fair valuation" of the property to the going concern. But, again, if some unusual situation makes it apparent that the particular property has a market value over and above the general market value for similar lots, then this increase in value would have to be included in a fair valuation.

In this case some parcels of property happen to lie upon an improved street, or in a peculiar location, and values much greater than those at which the property was placed upon the books or shown by the bank's inventory can be realized. In other localities, the property if thrown upon the market at a time like the present, when sales could not readily be made, would find as a market value much less than what was a fair valuation from the standpoint of the bank before it closed its doors.

It would appear that the valuation of the Banking Department and those appraisers for the creditors who have fixed their estimates upon what they think the property ought to bring at ordinary sale, as distinguished from what Mr. Ginsberg would like, and expected, to have it bring, is a fairly accurate valuation for our purposes.

The testimony of Mr. Ginsberg and his experts must be viewed with some allowance for their expressed intention to fix the value which they think the property ought to bring before its owner should be willing to sell, and that would seem to be higher than the fair valuation of the bankruptcy statute. The values in the Banking Department inventory give a fair total for our purpose.

[2] The second item about which a difference in valuation exists is that of the mortgages held by the bank. These are substantially, in practically all instances, second or third mortgages given for loans to persons who have undertaken building operations. These properties

are subject to mortgages already thereon and to which the bank's mortgages are subordinated.

Here again the experts generally agree that the valuations of the property from the standpoint of ultimate realization are not excessive. The Banking Department has made substantially no deductions. The creditors' experts generally have figured a reduction of from 10 to 20 per cent., which is actually the amount of bonus or discount exacted by those who make a business of purchasing (that is, discounting) such mortgages as a general business proposition, when a sale is forced or when the mortgage is not paid off at its expiration.

It does not seem to be disputed that the properties are worth, or will reasonably be worth, if the building operations are carried through, the amounts of the liens upon each parcel. Again, a fair valuation of such securities would seem to be what can be realized therefrom from the standpoint of a solvent or going bank, and not the so-called market value which could be obtained by treating them as quick assets, like commercial bonds or certificates of stock. But some losses and unusual expenses are probable and must be deducted in fixing market values. The exact deductions fixed by the witness Meyersohn would seem fair in amount, viz., $25,987.87.

Another item as to which much discussion has been had and testimony taken is the property of the Canal Realty Company. It appears that Mr. Kobre had an investment representing between $60,000 and $70,000, upon which he was losing money in New York. The Canal Realty Company was organized and $100,000 worth of stock issued therein. Mr. Kobre conveyed this property and sufficient cash to make up the total sum of $100,000, and received the total issue of stock therefor. One share was transferred to Ginsberg, and one share apiece to two others as directors, and the certificates of stock have always been held in the Brownsville Bank. The deeds and papers representing the operations of the company in Brownsville have also been kept in the Brownsville Bank, while the cashbook and bank account were kept in Canal Street.

This seems to be the way in which Mr. Ginsberg and Mr. Kobre checked each other with respect to this institution, although Kobre was placing in Ginsberg's hands the conduct of the business and the investment of the moneys.

With the $100,000 realized in this way, Ginsberg proceeded to purchase or acquire by trade property in Brownsville. He has made sales and conducted building operations, in the course of which he has made contracts with other parties, and the net result is an apparent surplus of some $73,246.40 at the time the bank closed.

There has never been a declaration of dividend upon the stock. Neither Kobre nor Ginsberg has ever acted as if the property taken in the name of the Canal Realty Company belonged to its stockholders in the ordinary sense. A year or so ago, the Canal Realty Company being inactive, the books of the corporation, including the minute books, were taken over to New York by Kobre, although the certificates of stock were not removed by him from the Brownsville Bank, and he

proceeded to use the Canal Realty Company as a dummy corporation, for certain transactions which he did not wish to conduct in his individual name. While these were being carried on, records thereof were kept in the New York Bank; but ultimately the entire books of the Canal Realty Company were brought back to Brownsville and the bank account transferred from Canal Street to the Brownsville Bank. This was upon the 22d day of June, 1914, the amount of the bank deposit transferred being $17,000 net.

The books show that in 1913 Mr. Weinstein, a clerk in the Canal Street Bank, apparently knowing that no dividends has been declared, and that the $100,000 originally invested had been left upon the books, without increase or payment for the use thereof, charged up interest against Brownsville, in behalf of the Canal Realty Company. Mr. Kobre ordered this item of interest stricken off, and it is apparent that as he was the party holding the stock, and as, according to all the testimony, he was under agreement with Ginsberg to turn the amount of capital stock over to Ginsberg for investment and division of profits, he could not charge interest and claim profits as well.

Both Kobre and Ginsberg now testify that the actual investment of funds by the Canal Realty Company was being made by the Brownsville Bank, and that Kobre and Ginsberg were to share in the profits therefrom through their sharing in the benefits of the Brownsville Bank, although Mr. Kobre, when first questioned upon the subject, testified that Ginsberg was to have one-half and he was to have one-half of the net profits, and did not state that it was to be done through distribution of the net profits in the Brownsville Bank.

If we consider that the property was invested by the stockholders in a partnership venture, then one-half of the net profits belongs either to Moses Ginsberg or to the Brownsville Branch and is available for its debts. As Moses Ginsberg admits that this amount belongs to the bank and not to himself, it should be added to the bank's assets. The other one-half belongs to Mr. Kobre, as agent or real estate operator for the Canal Realty Company.

The Brownsville Bank must account to the Canal Street Bank for the total value of the capital stock; but the profits are subject to the set-off of Ginsberg's share and to any debt of Kobre's to the Brownsville Bank, like the Oppenheim loans which he took over, and Ginsberg's claim for commissions.

The argument might be presented that the entire $100,000 representing the capital stock of this corporation is the individual property of Kobre, and is available to pay his creditors in this district, if the firm property is not sufficient to pay the firm debt; but the capital stock of the Canal Realty Company seems to be so plainly the property of the Canal Street business, or impressed with a trust for the benefit of the New York Bank, that no claim has been made by any of the Brownsville creditors thereto. The law recognizes no legal trust in real property bought by agents with the principal's money, and taken in the name of the principal (the Canal Realty Company). The claims of Ginsberg and Kobre to the surplus are really only charges or debts

by reason of their contract for the investment and sharing of the proceeds over the guaranteed fund ($100,000), and can be retained only as set-offs against the property to be returned on an accounting.

We have therefore, as shown in the table:

Real estate of the Canal Realty Company..........................$167,000.00
Interest of the Canal Realty Company............................. 637.40
A mortgage of the Canal Realty Company....:..................... 19,000.00
Cash balance from the $17,000 balance........................... 3,988.25
Cash paid by Brownsville for Canal Street, but belonging to the
  Canal Realty Company........................................ 4,620.75

    Total ...................................................$195,246.40
Against this we must charge a mortgage of..........$ 22,000.00
And the capital stock.............................. 100,000.00

    Total ................................................ 122,000.00

    Balance ....................................... $ 73,246.40

(Ginsberg claims some $2,500 paid for taxes, etc., but proof of this has not been furnished.)

One half of the balance or $35,623.45 belongs to Brownsville, and the other half is available for a set-off against Kobre's individual debts to the Brownsville Bank.

Another item included by Mr. Ginsberg as his total of assets of the Brownsville Bank consists of commissions charged by him for services as broker in purchasing real estate, making mortgages, etc., for New York after Ginsberg was contemplating the entry into a formal partnership with Mr. Kobre in all three institutions. Ginsberg and Kobre both testify that they had an agreement under which Ginsberg was to go ahead and do the work, as manager of the Brownsville Branch, necessary to make these investments for New York, with the understanding that if the partnership was consummated it would be for the interest of the entire estate, and that he as partner should not receive compensation therefor. But they both testify that it was understood between them that, if the partnership was not consummated, the ordinary commissions for making these investments should be paid out of the investments, and Ginsberg now claims that the Brownsville Bank is entitled to receive from Mr. Kobre these sums.

The strange result would have followed that, if the Brownsville Bank had continued and produced a surplus, Kobre would have received one-half the profit for the work done by Ginsberg and for which Ginsberg was charging. The services rendered by Ginsberg were in addition to, not in depreciation of, his work for Brownsville, and, although Mr. Ginsberg and Mr. Kobre may have discussed this question, Ginsberg had no agreement other than that Kobre would pay him for his services. The evidence of a definite agreement for the Brownsville Bank is not persuasive.

The benefits expected from the partnership necessarily included the risks or the trouble incurred by the intended partners, and this item would seem to be nothing more than a general claim against Canal Street for the services which Ginsberg rendered, as distinguished from

the services which he rendered when he went to New York and gave advice or made investments in anticipation of the expected partnership.

If Moses Ginsberg as an individual has a claim chargeable against New York assets for these services, it would be added to his personal assets in the Brownsville Bank, and amounts to one-half of the amount admitted by himself and Kobre as the value of the services. But he claims this only as an asset for the Brownsville creditors, and it should therefore be added to the total thereof.

The Oppenheim matter is an illustration of the care with which the business of the Brownsville Branch was separated from that of the other institutions and shows the way in which Mr. Ginsberg actually exercised the functions of a partner as distinguished from an employé on behalf of Brownsville.

It seems that one Oppenheim had secured a loan from Brownsville, upon Mr. Kobre's request, and for which Mr. Kobre as an individual was held responsible. Ultimately this loan was marked off to the amount of $7,320.99, and this item, together with the balance retained in the form of notes, making a total of $10,420.99, was assumed by Max Kobre and charged against Canal Street.

It would seem that this sum was properly held as an individual debt against the account of Max Kobre, and hence was properly charged against Canal Street; but it must first be deducted from the property of Max Kobre in the Eastern district, such for instance as his share in the Canal Realty Company profits.

But one other general class of items is in dispute. Certain outstanding notes or bills receivable, amounting at the present time to about $69,000, have not been collected. According to the testimony, the greater part of these notes can be and will be collected, or there is such reasonable prospect of their collection that from the standpoint of a going concern they certainly could in a large measure be treated as assets. The amount fixed by the creditors' appraisers generally as a deduction therefore would seem to represent the probable loss and is the same as the amount included by the Banking Department, viz., $10,659.46 less the Oppenheim note of $3,100, or in round figures $7,500.

One of the attorneys for the creditors has taken the deficit shown by the statement of the Banking Department, and, without adding any of the items shown by the testimony not to have been included therein, has added to the deficit the total amount of these notes which have not as yet been paid, viz., $69,000 (this includes again the $10,-654.46 already deducted), the discount which would have to be given if the mortgages were sold or discounted with mortgage brokers, viz., $59,777, and the total amount of taxes chargeable against all the property, without apportionment as indicated in the testimony. He thus makes a total deficit of $244,051.34; but, as has been seen the taxes are much less, such a large deduction for mortgages should not be made, and the deduction for commercial paper must stand at $7,500 and cannot be deducted twice, while the deficit shown by the Banking Department is substantially reduced by the property included as as-

sets and not so treated by the Bank Examiner in making up that statement.

In summarizing, therefore:

We must add to the assets already found, viz..................$1,494,770.10
The sum of one-half commissions claimed, viz...................    8,680.40
And one-half the surplus of the Canal Realty Co., viz...........   36,623.45
                                                                 _____
    Total  ...................................................$1,540.073.95
And against this charge the liabilities previously found, viz......$1,527,151.97
And the depreciation on mortgages, viz.........................   25,987.87
And the depreciation on commercial paper, viz.................    7,500.00
                                                                 _____
    Total  ...................................................$1,560,639.84

—leaving a deficit of $20,565.89 by which the amount of the liabilities exceed that of the assets.

Upon this showing, and assuming that neither Max Kobre nor Sarah Kobre have property within this district available for the payment of all firm debts of the Brownsville Bank, and that they are, as individuals, insolvent, even though they can be adjudicated in this district, only subject to their adjudication in the primary proceeding against them in the district of their residence, we have the situation of an insolvent partnership with two insolvent partners, and with a third partner who is solvent and whose estate would make up a total sufficient to render the partnership as a whole solvent at the time of the filing of the petition. It would also seem to follow that the total assets available for the payment of the creditors' debts, under the administration of the estate in bankruptcy, and including the individual assets of Moses Ginsberg, may not be sufficient to entirely meet all the claims thereon at the present time.

The condition of the bank at the time of the commission of the alleged acts of bankruptcy must be taken as the standard from which to view an alleged fraudulent transfer or other alleged act of bankruptcy "while insolvent" under section 3a. But the condition of the bank at the time of filing the petition is to be taken as the standard from which to test the defense of "solvency" in order to give jurisdiction in bankruptcy under section 3c.

While the acts alleged as acts of bankruptcy in this case preceded the 3d day of August, 1914, and the petition herein was not filed until August 7, 1914, all the parties hereto have taken the values of assets and liabilities as substantially the same at the different dates, and have used the figures as of the date of August 3, 1914, for all purposes. The first petition against Max and Sarah Kobre was filed August 7, 1914.

Since the petition was filed, there have been large expenses and no profits from new business operations. The expenses of liquidation will be large and protection of the real estate will require considerable expenditures. From these standpoints, the likelihood of realizing less than would have been available on August 3, 1914, is very plain.

On the other hand, an improvement in the real estate market, or some fortunate sale under changed conditions, may make it possible to pay the creditors in full. A change of one or two items would

make a solvent situation on the present figures. Ginsberg has shown a number of parcels which taken alone would seem to be capable of producing excess enough over the appraisals to wipe out the entire deficit.

On such a showing, no one could find Ginsberg's claims to be absolutely unfounded or plainly and willfully false. Leaving Canal Street out of consideration, Kobre and Ginsberg might well have expected that the Brownsville Bank would (if real estate values again rose and no mishap forced liquidation) furnish a large profit. But the Canal Street Bank made a difference in the situation, and without the Brownsville Bank's assets Kobre was in financial trouble. With this impending as Ginsberg knew, and in the then condition of the real estate market, Ginsberg and Kobre were bound by knowledge of actual values for their assets and cannot avoid legal insolvency for the partnership by large hopes. In fact, Ginsberg seems to make no claim that the assets would be enough to meet the forced sales, foreclosures, and expenses which would surely follow the immediate liquidation made necessary by Kobre's insolvency and the dissolution of the firm.

While therefore the court must determine the issue of solvency without reference to after results (Duncan v. Landis, 106 Fed. 839, 45 C. C. A. 666), yet, when an individually solvent partner has not assets sufficient to make up the deficit of the firm, so that the creditors are admittedly certain to receive less than 100 cents on the dollar if the estate is administered out of bankruptcy, the distinctions considered in Francis v. McNeal, infra, immediately become of greater importance, and in a close case like the present the application of the statute must be as exact as may be.

[3] Ginsberg's personal assets are enough in amount to wipe out the deficit shown above. Ginsberg admits that with Kobre insolvent and the partnership dissolved he cannot preserve the estate and pay 100 cents on the dollar unless the court protects the liquidation by compelling equality of dividends and order of payment. Where the partnership is found insolvent, as in this case, the acts proven would be acts of bankruptcy as against the partners, but would not be acts of bankruptcy as against one partner individually if his estate were sufficient to wipe out the partnership deficit. In re Bertenshaw, 157 Fed. 363, 85 C. C. A. 61, 17 L. R. A. (N. S.) 886, 13 Ann. Cas. 986; Vaccaro v. Bank, 103 Fed. 436, 43 C. C. A. 279; Francis v. McNeal, 228 U. S. 695, 33 Sup. Ct. 701, 57 L. Ed. 1029.

[4] In the present case, therefore, it must be held that the Kobres and Ginsberg were insolvent and committed acts of bankruptcy as partners, and that as such the partnership could be adjudicated bankrupt under section 5a, if the personal assets of Ginsberg do not remove the possibility of finding insolvency as to the firm and if the present case can come within the bankruptcy jurisdiction to adjudicate as to the partnership.

The present bankruptcy statute provides, in section 5a, that "a partnership * * * may be adjudged a bankrupt," and, in section 5h, that:

"In * * * event of one or more but not all of the members of a partnership being adjudged bankrupt, the partnership property shall not be administered in bankruptcy, unless by consent of the partner or partners not adjudged bankrupt; but such partner * * * shall settle the partnership business * * * and account, etc."

The cases In re Meyer, 92 Fed. 896, affirmed 98 Fed. 976, 39 C. C. A. 368, In re Stokes, 106 Fed. 312, Dickas v. Barnes, 140 Fed. 849, 72 C. C. A. 261, 5 L. R. A. (N. S.) 654, and In re Bertenshaw, supra, stated the proposition that under the present statute a partnership could be adjudged bankrupt as a separate entity, even though one partner was not adjudicated and although his assets were not included in the computation. In some of these cases it was held that, even if one partner were solvent and had assets sufficient to make the partnership solvent, it would not prevent adjudication of the partnership and the administration in bankruptcy of the partnership estate and even of the solvent partner's assets as well.

In Vaccaro v. Security Bank, 103 Fed. 436, 43 C. C. A. 279, it was held that a partnership could not be insolvent and therefore could not be adjudicated if one partner was solvent individually and had assets sufficient to overcome the deficit of the partnership. It was held that section 5a did not apply in such a case, and that section 5h referred only to the administration of an estate where one partner was insolvent, and another partner, and hence the firm, was solvent.

The idea seems to have been presented by Judge Thomas in Chemical Bank v. Meyer (D. C.) 92 Fed. at page 898, and was decided also by Judge Brown In re Blair, 99 Fed. 76, and in Solomon v. Carvel (D. C.) 163 Fed. 140, although the latter case assumed the doctrine of In re Bertenshaw, supra, to have been settled.

But the question is disposed of by the cases of Francis v. McNeal, 228 U. S. 695, 33 Sup. Ct. 701, 57 L. Ed. 1029, which upholds the doctrine of Vaccaro v. Bank, supra, and by the case of In re Samuels & Lesser, 215 Fed. 845, 132 C. C. A. 187 (C. C. A. 2d Circuit). In the latter case it is held that while a firm may be adjudicated a bankrupt, if it and all of its members are insolvent, nevertheless no firm can be compulsorily adjudicated a bankrupt in which any partner appears to be solvent to the extent of having a surplus of property over the debts for which he is personally liable and the debts for which he is liable as a member of the firm.

This proposition is based upon the decision of Francis v. McNeal, supra, but in that case the exact question presented in this case was referred to by the Supreme Court. The court there said:

"But the fact remains as true as ever that partnership debts are debts of the members of the firm, and that the individual liability of the members is not collateral like that of a surety, but primary and direct, whatever priorities there may be in the marshaling of assets. * * * Therefore ordinarily it would be impossible that a firm should be insolvent while the members of it remained able to pay its debts."

[5] In a case where one, but not all, of the members of a partnership are adjudged bankrupt, "the partnership property may be administered by the partners not adjudged bankrupt and does not come into bankruptcy at all except by consent. The partnership cannot be in

bankruptcy if the partners are not." The court further says that it "would be a further anomaly not to distribute all the partnership assets. Yet the individual estate after paying private debts is part of those assets so far as needed."

In that case, the objecting partner did not oppose the administration of the firm and individual property by a trustee in bankruptcy. The court affirmed the decree by which the trustee applied to the use of the creditors in bankruptcy the firm property and that of all of its individual members. The objecting partner was ordered to turn his real estate over to the trustee, who was given leave to sell the same; it being admitted that ultimately the property of all would be insufficient to pay the entire firm debts. The court said that the exception in the bankruptcy law, under section 5h, where one or more, but not all, of the members of a partnership were adjudged bankrupt, meant that the partnership did not come into bankruptcy at all except by the consent of the solvent partner.

It would seem therefore that, if the total assets of the firm and individuals will not suffice "to pay the partnership debts," the firm property and the individual properties may be administered in bankruptcy if the firm is insolvent and if the unadjudicated partner does not object, i. e., consents thereto. This would seem to make the case like a voluntary bankruptcy but without the adjudication of the solvent partner.

The effect of a "discharge" which is said to be the object of a bankruptcy proceeding was considered to be a difficulty in Chemical Bank v. Meyer, supra, and in Francis v. McNeal, supra. In the latter case it is said that it would be an incongruity to grant a discharge in such a case from the debt considered as joint, but to leave the same persons liable for it considered as several.

But in practice this difficulty does not arise. In the present case the Kobres, if they surrender their property, may apply for a discharge as individuals and as members of the firm. If Ginsberg is not adjudicated, he cannot be discharged, and the debts of the firm will be discharged only by payment in full if that be possible. The firm as such cannot apply for discharge, and the debts will not be discharged except as the individuals are discharged, for the debts will not cease to be enforceable until the individual properties are applied to their payment and until the individuals also qualify for discharge.

Hence, if the firm is insolvent and a solvent partner consents to the administration of the firm and individual assets, it would seem that section 5h would apply and that an adjudication against the insolvent partners and against the firm would be legally possible. The administration of all the assets in the bankruptcy court would follow, and the solvent partner would be entitled to guide or share in that administration under the jurisdiction of the court.

In the present case Ginsberg has now consented to turn over his individual property to the bankruptcy court and to join in the administration of the estate even if the firm be held solvent. The determination that the firm is insolvent avoids the difficulty of concluding whether this creates a voluntary bankruptcy on his part, even if he

shows solvency as an individual and as a partner. His acceptance of jurisdiction and the admission thereby that he cannot meet the debts outside of bankruptcy administration seem to make it possible to proceed with the adjudication of the firm and to administer all the assets thereunder. If he be so fortunate as to have some property left after the debts of the firm and his individual debts are paid, no one can object, for the debts will be discharged by payment in full.

The partnership assets of the Brownsville Bank are available, first, to the depositors and creditors of that bank as a partnership. If the assets of that bank shall meet the claims of those creditors, then the surplus, under the circumstances, will be divided and the share therein of the Kobres will be turned over to the trustee in bankruptcy of the Kobre estate in the proceeding in the Southern district, if an adjudication in that proceeding be ever obtained and a trustee elected. If no adjudication should be had in the proceeding in the Southern district, and if a composition should result, then the Kobres' debts will be wiped out, and any surplus from the Brownsville Bank belonging to Kobre and his wife would be turned back to them or their successors.

If we look at subdivision "f" of section 5, we shall see that the net proceeds of the partnership property are to be used first for the payment of the firm debts, and if any surplus remains therefrom it shall be used to pay the debts of the individuals. "Should any surplus remain of the property of any partner after paying his individual debts, such surplus shall be added to the partnership assets and be applied to the payment of the partnership debts." This plainly contemplates that a partner may be solvent and have a surplus of assets. If so, that surplus is to be added to the partnership assets, and if the partnership is insolvent, and the other partners do not have a surplus of assets, that is, are insolvent themselves, then there could, as in Francis v. McNeal, supra, be no solvent partner unless the surplus of that partner who had a surplus over his individual debts should be sufficient to pay all of the firm debts for which he is liable. If his surplus were insufficient, then the firm would be insolvent and all of the partners ultimately insolvent. Ginsberg could get no discharge, but would still be liable for the balance, and the firm would be dissolved with its debts paid in part and not discharged so far as Ginsberg is concerned.

The case of Samuels & Lesser, supra, therefore, in so far as it decides that a partnership cannot be insolvent provided one partner is solvent, does not cover the case presented herein under subdivision "h," where the partner not adjudged a bankrupt consents to the adjudication of the partnership or acquiesces in the finding of insolvency of the partnership and consents to the administration in bankruptcy.

In the case at bar, the individual assets of Max Kobre and Sarah Kobre, his wife, are not available to the partnership creditors in this district until they have been applied to the partnership debts in the Canal Street Bank, except as a set-off may occur.

The adjudication as to Kobre and his wife in this district means only that a surplus of the firm assets, if such should result, will be divided and their shares turned over to their trustee in the Southern district of New York or be dealt with on composition there if one be put through.

An adjudication as to Max Kobre and Sarah Kobre as individuals and of the partnership of Max Kobre, Sarah Kobre, and Moses Ginsberg will be had.

In the selection of trustées, the rights of Moses Ginsberg under the analogy to section 5h will require his election as one trustee, and will enable him to thus "settle the partnership business" and account therefor.